14 F.2d 371 (1926)
THE WOLSUM.
THE WEST HIMROD.
STOOMVAART MAATSCHAPPY OOSTZEE
v.
UNITED STATES.
No. 4140.
Circuit Court of Appeals, Fifth Circuit.
June 30, 1926.
*372 George Denegre, Victor Leovy, and Henry H. Chaffe, all of New Orleans, La. (Harry McCall and Jas. Hy. Bruns, both of New Orleans, La., on the brief), for appellant and appellee.
J. Frank Staley and Edouard F. Henriques, Special Asst. Attys. Gen., for appellee and appellant.
Before WALKER, BRYAN, and FOSTER, Circuit Judges.
WALKER, Circuit Judge.
After the owner of the steamship Wolsum had filed a libel against the United States, the owner of the steamship West Himrod, for damages claimed to have been sustained by the first mentioned steamship as the result of a collision between the two steamships, and after the owner of the West Himrod had filed a libel against the Wolsum for damages alleged to have been sustained by the West Himrod as a result of that collision, the two causes were consolidated. By the decree rendered in the consolidated cause the court found that the collision was the result of faulty seamanship on the part of each steamship, that the damage sustained by the owner of the Wolsum was the sum of $36,290.99, and that the damage sustained by the owner of the West Himrod was the sum of $350.74, making a total of $36,641.73, and that such total should be equally divided between the two parties, and decreed that the owner of the Wolsum recover from the United States one-half of such total, with interest at 4 per cent. from the date of the decree; each party being taxed with one-half of the court costs. Each party appealed from that decree. The testimony as to the circumstances of the collision was taken by depositions; the witnesses not testifying in the presence of the court. Other evidence was adduced in the presence of the court. After the appeals were sued out, additional testimony was taken by depositions at the instance of each of the parties.
The collision occurred near 7 o'clock in the evening on April 2, 1922, a short distance inside the breakwaters at the entrance of Limon Bay, while the Wolsum, laden with a cargo of lumber, after passing through the Panama Canal, was bound, first for Pernambuco, on a voyage to South Africa, and the West Himrod, loaded with sugar and on a voyage from a Cuban port to Vancouver, B. C., was proceeding towards the Panama Canal. The night was clear, so that lights were visible from a great distance, and the wind was from the north, blowing at the rate of about 18 miles an hour. From each of the two sides of the entrance to Limon Bay a breakwater extends, the one from Toro Point on the west side in a northeasterly direction, and the one on the east side from a point off shore in a northwesterly direction, the opening between their seaward ends being about *373 700 yards wide, a line between those ends running east and west, that line being at right angles with a line running north from Gatun, south of the southern end of Limon Bay, along the center of the dredged channel to the seaward entrance of the bay between the breakwaters. If a ship intending to enter the bay from the Carribbean Sea takes a position directly north of the center of the opening, the Gatun lights are directly to the south, and the ship is midway between the lights marking the dredged channel.
Testimony of the master of the Wolsum was to the following effect: The pilot left the Wolsum about 20 minutes after she left the coal pier at Cristobal, the Wolsum then being clear of the docks, in the center of the channel, about 4,000 yards from the breakwater, and on a northerly course. About the time the pilot left the master, who was on the bridge, saw a steamer, which turned out to be the West Himrod, two or three miles outside the breakwater, coming from the westward. When the Wolsum, while on the same course, and moving at about 7 knots an hour, had just cleared the outer buoy inside the breakwater, and the vessels were about a half or three-quarters of a mile apart, the West Himrod being still outside the breakwater, and the Wolsum about 1,500 yards from the entrance, the Wolsum gave a signal of one short blast, which was answered by one short blast from the West Himrod, and the Wolsum then went one point to starboard, continuing its speed of about 7 knots an hour. Soon thereafter, the West Himrod not having changed its course, the Wolsum gave another one-blast signal, which was answered by a one-blast signal from the West Himrod. At that time the Wolsum was between 50 and 100 feet east of the center of the channel. Thereafter the West Himrod gave a signal of three short blasts, which was answered by one short blast from the Wolsum. A second time the West Himrod gave a signal of three short blasts. The West Himrod continued to go ahead after the three-blast signal was given. The vessels were too far apart for the master of the Wolsum to tell whether the engine of the West Himrod was put full astern following the giving of the first three-blast signal. The Wolsum continued to go to starboard after the West Himrod gave the first three-blast signal, and continued its speed of about 7 knots an hour. When the master of the Wolsum saw that the West Himrod continued to go ahead, and that a collision was imminent, the engines of the Wolsum were put full astern, when the distance between the vessels was about 200 yards. Soon thereafter the starboard bow of the West Himrod struck the port bow of the Wolsum. When the Wolsum was struck she was on the eastern side of the center of the channel, about 100 or 150 yards from the eastern breakwater. As a result of the blow she was pushed on the eastern breakwater. If the West Himrod had been put and kept full astern after the first three-blast signal was given, the Wolsum easily could have passed the east breakwater without being struck. The Wolsum is 360 feet long, and, when moving at 7 knots an hour, could be stopped in about three ship's lengths.
Testimony of the master of the West Himrod was to the following effect: The West Himrod approached the entrance between the breakwaters from the northwest, the master stating that his course was "147 true," meaning 147 degrees east of north. As we approached on that course, "we didn't pick up our breakwater lights as soon as we ordinarily would have; they lined up with the city lights of Colon, and we were pretty close before we really were sure that we picked up the lights  before we were sure what the lights were." He figured to pass the west breakwater "a couple of hundred yards or so; maybe a little more off." He had been through that entrance once before going towards the canal, and had been through it several times before going in the opposite direction after passing through the canal. When his vessel was about 150 yards from the western breakwater light (which is inside the breakwater), he ordered half speed and hard aport, intending to swing around the west breakwater. After giving those orders, on finding that there was a powerful and unexpected current setting the ship towards the west breakwater, he gave an order to stop the engine. Just as that stop order was given, the vessel which turned out to be the Wolsum was first seen after it gave one long whistle, which was answered by the West Himrod with one whistle. He then ordered full steam astern, and blew three whistles. The Wolsum did not answer that signal. Next he gave a stop order because his vessel was in such a position that he feared her stern would go on the end of the west breakwater if full speed astern was continued. Next he gave another full speed astern order, and blew three whistles. The Wolsum answered with one short blast. The West Himrod continued full speed astern until the collision occurred. The West Himrod's engine room log showed that she went to half speed at 6:58, to stop at 6:59, to full speed astern at 7:00, to stop at 7:01, to full speed *374 astern at 7:02, and to stop at 7:04. The last noted stop was just after the collision occurred. With some variations as to details, the testimony of others aboard the West Himrod was similar to that of its master.
By executive order of the President, made under authority conferred by the Panama Canal Act (Comp. Stat. § 10041), rules of the road, including signals, have been prescribed for the navigation of the Panama Canal and approaches thereto. With slight modifications and additions deemed necessary to adjust them to local conditions, those rules are the same as the inland rules. U. S. Comp. Stat. Anno. § 7872 et seq. Under those rules, a signal of three short blasts of the whistle means: "My engines are going full speed astern." Rule 77. The danger signal is several short and rapid blasts, not less than four, on the steam whistle. Rule 79. The following are included in those rules:
"69. Risk of collision, can, when circumstances permit, be determined by carefully watching the bearings of an approaching vessel by compass, or otherwise; if the courses be converging and the bearing does not appreciably change, such risk should be deemed to exist. * * *
"101. The following speeds shall not be exceeded by vessels in transit through the canal:

 Knots
 per hour.
 Colon to Gatun locks ......................... 6
 Gatun Lake, in the 1,000-foot channels ....... 15
 Gatun Lake, in the 800-foot channels ......... 12
 Gatun Lake, in the 500-foot channels ......... 10
 Rounding Bohio and Darien bends .............. 6
 Gaillard cut ................................. 6
 "Rounding bends  Slowest speed at
 which steerageway can be maintained. * * *
 Entering or leaving port ..................... 6

* * * * * *
"104. When two steamers are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steamer is overtaking another, the steamer which has the other on her port side shall hold her course and speed; and the steamer which has the other on her starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steamer, or, if necessary to do so, slacken her speed, or stop, or reverse. The steamer having the other on her own port bow shall blow one blast of her whistle as a signal of her intention to cross the bow of the other, holding her course and speed, which signal shall be promptly answered by the other steamer by one short blast of her whistle as a signal of her intention to direct her course to starboard so as to cross the stern of the other steamer or otherwise keep clear.
"105. If, from any cause whatever, the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall at once be made apparent by blowing the danger signal, and both steamers shall be stopped and backed, if necessary, until signals for passing with safety are made and understood. * * *
"107. Every vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed, or stop, or reverse."
A government publication, entitled H. O. No. 130, Central America and Mexico Pilot (East Coast) Second Edition, 1920, contains information and directions for persons engaged in navigating vessels in the Panama Canal and its approaches, including the following:
"General Directions.  There are no difficulties for vessels entering Limon Bay day or night, provided they keep on the Gatun range until the ends of the breakwaters have been passed. Owing to the fact that the light at the seaward end of Toro Point breakwater is built in the elbow, and that therefore part of the breakwater lies between the light and the channel, vessels entering, particularly at night, should give the light and breakwater a wide berth, of at least 300 yards.
"When the Gatun lights have been picked up and brought in range, bearing south, a vessel should proceed at slow or half speed, keeping the lights in range, and passing halfway between the breakwater lights, noting at the same time that the Gatun range lights are kept midway between the light-buoys showing red and white flashing lights and the fixed beacons which mark the dredged channel and will naturally show in perspective toward the foot of the bay.
"If entering at night, after the flashing red light on the seaward end of the west breakwater and the Toro Point Light have come in range, turn around the end of the breakwater to the westward and southward, giving it berth of about ¼ mile, and anchor under it at a distance of about ½ mile, in not less than 6 fathoms, favoring the seaward end.
"Vessels entering at night should be particularly careful to keep on the entrance range, and pass between the flashing red *375 light on the end of the west breakwater and the lightbuoy showing a flashing white light which is moored off the seaward end of the east breakwater."
By the version of the occurrence given by testimony in behalf of the West Himrod, it is disclosed that she approached the entrance between the breakwaters at such an angle as to make it impossible, until she was close to the west breakwater, for those on board to distinguish the lights marking the entrance and the dredged channel from other lights inside the entrance  many lights at Colon and Cristobal, located on the eastern shore of the bay, being visible to those on board who were looking ahead; that the attempt to turn to starboard so as to go between the breakwaters was made when the vessel was so close to the seaward end of the west breakwater that the maintenance of the intended southerly course was interfered with by maneuvers deemed necessary to keep the wind and currents from carrying the vessel against the west breakwater; and that the result of such maneuvers was that, instead of the vessel passing the breakwaters, and proceeding south in the dredged channel, and complying with its agreement to keep out of the way of the Wolsum, her course continued to be towards the east breakwater until she passed the center of the dredged channel, and collided with the Wolsum when the latter was considerably east of the center of the channel. So far as the evidence indicates, there was nothing to keep the West Himrod, before attempting the passage between the breakwaters, from getting in a position directly north of the opening and far enough therefrom to enable it to pick up the breakwater lights, the dredged channel lights, and Gatun lights, and then to proceed on a course the maintenance of which would not be interfered with by maneuvers required to avoid contact with either breakwater. We think that the evidence requires the conclusions that the seamanship of those in charge of the West Himrod was faulty, in that the handling of it in the attempt to pass between the breakwaters was marked by an unjustifiable disregard of precautions called for by the situation dealt with, and that such faulty seamanship was a proximate cause of the collision. The West Himrod's nonobservance of reasonably necessary precautions is made apparent by comparing the handling of it, as shown by the testimony of its master, with the handling of a vessel by one who followed the above-quoted directions for the navigation of vessels entering Limon Bay. Even without those directions, it well may be inferred that an ordinarily observant and cautious navigator, having the knowledge of the situation acquired by having passed between the breakwaters several times before, would realize the advisability, in approaching the entrance, of keeping far enough away from the breakwaters to have ample sea room to do what might be required to keep the course selected to pass with safety a vessel or vessels going out; the risk involved in having to depart from his chosen course to avoid one of the breakwaters being avoidable by taking such precaution.
For the West Himrod it was contended that the Wolsum was at fault: (1) In maintaining a speed of more than 6 knots until her engines were stopped and reversed just prior to the collision; and (2) in failing to stop and reverse sooner than she did. The first mentioned contention is based on the assumption that the part of the above set out regulation 101 which forbids vessels "entering or leaving port" having a speed in excess of 6 knots an hour is applicable to a vessel so long as it is in Limon Bay on its way to sea, with the result that, if the Wolsum was violating that statutory regulation at the time of, or just prior to, the collision, the burden was on her to prove that such violation was not an efficient cause of the collision. Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 S. Ct. 270, 61 L. Ed. 726. That the word "port," as used in those regulations, does not include the whole of Limon Bay is made clear by regulations as to "ports" or "terminal ports." Under regulation 12 no vessel is allowed "to enter or leave a terminal port" without having a regularly authorized government pilot on board. Rule 16 shows that an authorized place for pilots to meet incoming vessels is "inside the breakwater at the Atlantic terminal." If Limon Bay was a "port" within the meaning of the provision in question, regulation 12 would not be complied with by an incoming vessel taking on a pilot inside the breakwaters. We think its context shows that regulation 101 did not have the effect of forbidding a speed exceeding 6 knots an hour for the Wolsum, while, after leaving Cristobal, and discharging her pilot where it was customary to do so, she was proceeding along the dredged channel towards the entrance between the breakwaters. To say the least, the language of the rule in question does not require the conclusion that a vessel is permitted to move at greater speed while in the 500-foot channels of Gatun Lake than when traversing the dredged channel of Limon Bay after getting clear of the docks of a *376 port at which she had stopped. It follows that there was no presumption that the Wolsum's speed of 7 knots an hour was an efficient cause of the collision.
In determining whether the Wolsum was or was not at fault in failing to stop and reverse sooner than she did, due consideration must be given to the navigation rules which were applicable to the situation. Above set out rule 69 states a method of determining risk of collision from an approaching vessel, and shows when such risk should be deemed to exist. Rule 104 prescribes the method of avoiding such risk in the case of two steamers approaching each other at right angles or obliquely. The evidence showed that the Wolsum, when on a northerly course, upon seeing the West Himrod approaching the entrance of Limon Bay from the west, performed the duty imposed by rule 69, and manifested her conclusion that risk of collision existed by taking action to avoid that risk. Certainly her initial action to that end was in accordance with the requirement of rule 104. Having the West Himrod on her port side, the Wolsum, in compliance with that rule, by blowing one blast of her whistle, signified her intention to cross the bow of the West Himrod and to hold her course and speed, and the West Himrod, by answering with one short blast of her whistle, signified her intention to direct her course to starboard so as to cross the stern of the Wolsum, or otherwise keep clear. That exchange of signals evidenced an agreement between the two vessels for a port to port passage. Under rule 104 an incident of that agreement was a duty on the part of the Wolsum to hold her course and speed. She was bound to continue to do so until it was disclosed to her that the West Himrod would not, or could not, comply with her agreement and duty to keep clear of the Wolsum. The decision in the case of The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126, was invoked to support the contention that the Wolsum should have stopped and/or reversed sooner than she did. In the opinion in that case (page 206 [20 S. Ct. 74]) emphasis was placed on a rule then in effect, "rule 21, American," "that every vessel * * * approaching another vessel so as to involve risk of collision, shall slacken her speed * * * and reverse." No such rule is included in the Panama Canal rules. Furthermore, that decision furnishes no support for a contention that a privileged steamer, as the Wolsum was, being entitled to hold her course and speed, would be under any duty to stop or reverse until there was a distinct indication that the obligated steamer, the one bound to keep clear, was failing, or about to fail, in her duty to do so. It has been settled by authoritative decisions that the privileged steamer is not at fault for maintaining her course and speed so long as there is absent any distinct indication that the obligated steamer is about to fail in her duty to keep clear. The Delaware, 161 U. S. 459, 469, 16 S. Ct. 516, 40 L. Ed. 771; The Britannia, 153 U. S. 130, 14 S. Ct. 795, 38 L. Ed. 660. The privileged steamer herself is at fault for prematurely stopping or reversing, or before all uncertainty as to the failure of the burdened vessel to keep clear is dispelled. The Brittannia, supra; Lake Erie Transp. Co. v. Gilchrist Transp. Co., 142 F. 89, 73 C. C. A. 313; The George L. Garlick (D. C.) 91 F. 922. Until the contrary plainly appeared, the Wolsum was entitled to presume that the West Himrod would comply with her agreement and duty to keep out of the way of the Wolsum. The Victory and The Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519. So far as appears, the West Himrod did nothing to inform the Wolsum of the West Himrod's difficulties or her inability to keep clear. The proper manner of doing so was by blowing the danger signal. Rule 105; The Delaware, supra. This was not done. The West Himrod's three-blast signals meant nothing, except that she was reversing her engines. It is contended that the conduct of the West Himrod, observable by those aboard the Wolsum, clearly indicated, before the Wolsum stopped or reversed, that the West Himrod would cross the course of the Wolsum. We are of opinion that the record does not support that contention. The fact that the West Himrod, after signaling that her engines were going at full speed astern, continued to go forward towards the east breakwater was not enough to show that she would not stop before she crossed the course of the Wolsum, as it is to be expected that a vessel will continue to go forward for some time after her engines are stopped or reversed. So far as appears, those aboard the Wolsum had no means of learning that the full speed astern movement of the West Himrod was arrested by stopping the engines, thus delaying the stopping of that vessel. There was no testimony in conflict with that of the Wolsum's master to the effect that, if the West Himrod's engines had been kept going full astern after the first three-blast signal was given, the collision would not have occurred. The burden of proof was on the West Himrod to establish that the Wolsum was at *377 fault in failing promptly to stop or reverse after all uncertainty as to the failure of the West Himrod to keep out of the way was dispelled; and, the fault of the West Himrod being obvious and inexcusable, the evidence to establish fault on the part of the Wolsum must be clear and convincing in order to make a case for dividing the damages. The Victory and The Plymothian, supra. We are of opinion that the evidence did not clearly and convincingly show that, after all uncertainty as to the failure of the West Himrod to keep out of the way was dispelled, the Wolsum did not promptly stop and reverse, though it was then too late to avoid a collision by doing so, or that any fault on the part of the Wolsum was an efficient cause of the collision. It follows that the court erred in decreeing a division of the damages.
The owner of the Wolsum complains of the disallowance of items of damages claimed to have been caused by the collision, including interest at 9 per centum per annum on the sum of $31,000 deposited in cash to obtain the release of the Wolsum, and demurrage for the time the vessel was detained pending repairs made necessary by the collision, at the rate payable under the charter party in the case of detention on account of a default on the part of the cargo owner.
On May 7, 1922, the Wolsum was released on the making of a deposit of $31,000 as a cash bond. By testimony taken after the appeals were sued out, it was shown that it was practicable for the Wolsum to obtain a surety bond for her release by a representative of her owner arranging for the furnishing of collateral or other satisfactory security to a surety company in the United States (several such companies having an agent in the Canal Zone), and that at that time the rate of premium on such a bond was one-fourth of 1 per cent. for each three months, or 1 per cent. per annum. Admiralty rule 7 provides: "If costs shall be awarded by the court to either or any party, then the reasonable premiums or expense paid on all bonds or stipulations or other security given by that party in that suit shall be taxed as part of the costs of that party." In the circumstances disclosed the owner of the Wolsum should be awarded the amount it would have had to expend to get a surety bond, but not the larger amount of interest on the $31,000 it elected to deposit as a cash bond.
Demurrage or damages for the loss of profits or of the use of a vessel pending repairs, arising from a collision, will only be allowed when profits have actually been, or may reasonably be supposed to have been, lost, and the amount of such profits is proved with reasonably certainty. The Conqueror, 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937. The evidence shows that the Wolsum is a tramp steamer. The charter party under which she was being operated at the time of the collision was offered in evidence, but it is not set out in the record on appeal. We are not informed of its nature or contents, except by a statement of a witness to the effect that he did not think that the charter party provided for the steamer paying demurrage for delaying the delivery of cargo, and by the following statement made in the opinion rendered by the district judge: "The Charter Party Exhibit TT, offered in evidence, provides that for each and every day's detention of the Wolsum on account of any default on the part of the owners of the cargo the latter shall pay to the Wolsum £50 sterling per day, and that the Wolsum is to allow the cargo owners a bonus of £20 sterling per day for all time saved in loading the vessel."
The record does not show that the Wolsum received less under that charter party than she would have received if there had been no collision and no detention for repairs. There was no evidence tending to prove that the Wolsum was under engagement for services to be rendered after the termination of the voyage which was interrupted by the collision, or that the collision and the detention for repairs caused it to lose any opportunity for profitable employment. The fact that the Wolsum had a contract right to be paid by the cargo owner a stated sum for each day's detention due to a default of the latter by no means indicates that she lost the same amount each day she was detained in consequence of a collision with another vessel. Witnesses in behalf of the Wolsum testified as to her average daily net earnings during the voyage, which was interrupted by the collision and was concluded after she was repaired. That evidence, unaccompanied by any evidence that the Wolsum was profitably employed after the termination of that voyage, or lost such employment in consequence of the detention pending repairs, falls far short of proving that her detention pending the making of repairs caused her to lose profits. We are of opinion that the evidence adduced was not such as called for an award to the owner of the Wolsum of demurrage for the period of her detention pending repairs.
As to other disallowed items of damage *378 claimed by the owner of the Wolsum, it is enough to say that the record does not show that the evidence relied on to sustain them was such as to require the allowance of them.
The owner of the West Himrod takes nothing on its appeal. On the appeal of the owner of the Wolsum, the decree is modified by striking therefrom the provisions as to dividing the damages found by making the principal amount decreed to be recovered by the owner of the Wolsum of and from the United States the sum of $36,290.99, and by taxing the court costs against the United States, such costs to include an item of $310, the amount of the cost of a surety bond in the sum of $31,000, from May 4, 1922, the date of the release of the Wolsum, to the date of the decree, February 21, 1923. As so modified, the decree is affirmed, costs to be taxed against the United States.
Modified and affirmed.