**THE AURORA et al.**

**No. 811.**

District Court, E. D. Louisiana,
New Orleans Division.

Feb. 9, 1945.

John J. Finnorn and A. Sidney Cain, both of New Orleans, La., for plaintiff.

Richard A. Dowling, of New Orleans, La., for defendant.

CAILLOUET, District Judge.

This action against the motor boat Aurora and its owner, Fred Loje, brought by Leo Protich, owner of the motor boat Karankawa, grows out of the Aurora's admitted collision with the Karankawa on Bayou Bell, in St. Bernard Parish, within the Eastern District of Louisiana, at approximately 9:15 o'clock on the night of September 8, 1944.

Each of these motor boats being over 40 feet in length and not more than 65 feet is of the Class 3 designation, 46 U.S.C.A. § 526a.

Both vessels, as they were under way immediately before and at the moment of collision, the Karankawa proceeding westward and the Aurora eastward, were then required to be carrying the following lights, viz.:

"1. A bright white light in front, set as near the vessel's stem as practicable, and showing 'an unbroken light over an arc of the horizon of twenty points of the compass, so fixed as to throw the light ten points on each side of the vessel.'

"2. A bright white light 'to show all around the horizon and higher than the white light forward.'

"3. On the vessel's starboard side, a green light so constructed as 'to show an unbroken light over an arc of the horizon often points of the compass, so fixed as to throw the light from right ahead to two points abaft the beam on the starboard side.'

"4. On the vessel's port side, a red light, under like requirements applicable to the light's set-up on the opposite side."

It was required that each such sidelight be fitted "with inboard screens of sufficient height so set as to prevent these lights from being seen across the bow".

Both white lights had to be of such character as to be visible from a distance of "at least two miles", and the green and red, from "at least one mile". The word "visible" so used, meaning "visible on a dark night with clear atmosphere." 46 U.S.C.A. § 526b.

Since both vessels were under 150 feet in length, each had it then been "at anchor" would have been required to "carry forward, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light in a lantern so con-

structed as to show a clear, uniform, and unbroken light visible all around the horizon at a distance of at least one mile". 33 U.S.C.A. § 81.

The libel alleged that the collision of the Aurora with the Karankawa, while the latter was holding to the right bank on her way westward, resulted from faulty navigation of the former's master, and claimed damages aggregating $3,950.

The answer denied that the Karankawa was so holding to the right bank of Bayou Bell, and averred that, as a matter of fact, the vessel was running "in the middle of the bayou nearer the left bank, and on the wrong side of the bayou for the direction in which it was travelling", while the Aurora was, herself, holding a course to the right bank, in her forward progress eastward, "as far over as it could safely go, and showing proper running lights."

The answer further averred that the collision was caused by faulty navigation of the Karankawa which, allegedly, was being operated, without running lights showing, on a dark night in a narrow bayou; and specifically averred, furthermore, that the only light apparent to the Aurora on said Karankawa was its anchor light, which condition "entirely misled the navigator of the Aurora and caused the accident."

From the evidence adduced at the trial it was established by the overwhelming preponderance of the evidence that the Karankawa's course was never in the middle of the stream, nor beyond it over on the left side of the bayou and nearer the south bank thereof, but, on the contrary, that the vessel did properly follow the north bank of Bayou Bell. Also, that Captain Protich steered the vessel in towards his right, over mud flats, in his effort to avoid the threatening faulty navigation of the Aurora, as that vessel veered from and left its own proper course along the south bank of the bayou, crossed the middle line of the stream and came over to and across the Karankawa's own proper course along the north bank. Furthermore, the witness Alfonso, one of the two members of the Aurora's crew and called to the stand by the defense, definitely testified that the Karankawa was no more than 4 to 5 feet away from said north bank when the bow stem of the Aurora drove into the vessel's port side, forward.

Bayou Bell, at the scene of the collision, was no less than 70 feet in width. So it was testified by Captain Loje, owner and master of the Aurora, and its navigator at the time of said collision. Other testimony on the subject, adduced by the libelant Protich, was to the effect that the stream's width at the point in question was approximately 200 feet.

Captain Loje strove to justify his otherwise palpable negligent act of steering the Aurora out of her own proper course eastward, between the middle line of the stream and the south bank of the bayou, into the Karankawa's westward travel lane along the north bank, by his own testimony and that of the Aurora's two crew members; which was substantially to the effect that the night was dark, with the wind blowing from the north, and that they seeing no light ahead but a white anchor light which first came into view when they were at least a mile away, both master and crew of the Aurora were misled into the erroneous belief that they were approaching an anchored vessel and not one on the way. For which reason (so runs the contention of the defense) an attempt was made to avoid running afoul of the anchor rope or chain between the vessel and south bank, by steering the Aurora out of her proper eastward course, between said southern bank and the middle of the stream, and making her swing over to port into the northern travel lane, for the intended purpose of passing the supposedly-anchored vessel on her starboard side, between her and the north bank of Bayou Bell.

However, since there was a wind blowing from the north, no prudent navigator, upon finding himself confronted by the alleged situation attempted to be depicted by the testimony on behalf of the defense, would attempt to pass the vessel on its starboard side, inasmuch as said vessel would naturally be anchored (if at all) from the north bank, with the anchor chain or rope stretched southward from anchor to the vessel's bow.

Even were it established that the master and crew of the Aurora were justified in believing the Karankawa to be at anchor, instead of on her way westward in Bayou Bell holding to her right or to the north bank, this would not satisfactorily explain why the Aurora was navigated into the Karankawa's travel lane.

The answer alleged that the Karankawa was proceeding westward in the middle of Bayou Bell, nearer the left bank, and that the Aurora was holding her course eastward, on its own right side of the stream (which was along said mentioned left or south bank), as far over as it could, safely.

The witnesses for both sides, including defendant Captain Loje, were unanimous in locating the Karankawa's position, at all times, within the stream's northern travel lane, and in placing the vessel, immediately preceding the collision, within but a short distance of the north bank.

Neither of the vessels involved in the collision was more than 12 to 15 feet in width, if that much, and since Bayou Bell was no less than 70 feet wide at the scene of the accident, according to Captain Loje's own testimony, and the Karankawa was running no more than 4 to 5 feet from, and parallel to, the north bank at the moment of impact, according to the witness Broussard, defendant's employee, it is obvious that the Aurora had before her, as an open course for her forward progress eastward, no less than half of Bayou Bell's admitted width of 70 feet.

It is apparently conceded that the Karankawa's running lights were actually burning, but the defense charges that they had all been covered and rendered invisible to the on-coming Aurora by the rolling up of the tarpaulin which ordinarily stretched as a shelter over the hold from the forward mast aft to the top of the cabin, and its having been laid across the front edge of said cabin. The testimony, as to this phase of the case, adduced on behalf of libelant is substantially that, not only were the running lights properly mounted and burning, but the rolled tarpaulin rested on the cabin top under the lights and in no manner interfered with their throwing light, as required, right ahead and to one side no further than to the prescribed number of compass points "abaft the beam". But both master and crew of the Aurora, who (as their testimony makes it appear) were looking forward from under that vessel's own stretched-out tarpaulin shelter, swore that nothing but a white light was visible to them and this they judged to be an anchor light. It is insisted that it was only when the Aurora was but a few feet from the Karankawa that Broussard, member of the Aurora's crew of two and claimed to have been on the lookout, shouted a danger warning and that only then did Captain Loje, the navigator, realize that the Karankawa was a moving vessel. He swore that he immediately reversed the Aurora's engines and brought the wheel hard right or starboard in an attempt to avoid striking libelant's vessel. The location of the Karankawa, when it was actually collided with on its port side, between bow and cabin, is undisputed. Its navigator had steered starboard away from the threatening collision, on to and over a mud flat close to shore where, churning mud, the Karankawa was moving westward very slowly and was actually distant but 4 to 5 feet from Bayou Bell's north bank when the Aurora's bow stem struck.

The defense signally failed to offer convincing explanation as to why the Aurora's master and crew did not sooner determine the Karankawa's true position and status, and the evidence leaves one without doubt that the Aurora was driving ahead, down tide, at her usual engine speed, notwithstanding the possibility that her navigation maneuver to port across the stream's middle line, which was decidedly out of the ordinary, might endanger another vessel then present before her.

Under the evidence, the Aurora was grossly at fault and the sole proximate cause of the collision was her negligent navigation. The case presents no factual set-up justifying the defense suggestion made in argument to the effect that the collision damages should be divided. Even were it considered proved that the running lights of the Karankawa, through her fault, were not visible to the Aurora and that said Karankawa furthermore negligently showed a *real* anchor light while on the way and not at anchor, nevertheless this would not justify the decreeing of a division. The M. J. Rudolph, 2 Cir., 1923, 292 F. 740, and cases there cited; The Wolsum. 5 Cir., 1926, 14 F.2d 371.

The damage done to the Karankawa was repaired by an experienced boat carpenter and his helper, and the proof was that the vessel was delivered and entrusted to him by libelant on the day following the collision, which was, therefore, September 9, 1944, and that four or five days thereafter the clearing out of the damaged portion of the boat hull and deck was begun, pending the necessary wait for delivery of the required cypress and pine lumber, the procuring of which by libelant was somewhat delayed owing to wartime

restrictions. It was found that three of the ribs or frames, eleven side planks and the decking and one deck beam had been shattered by the force of the blow which the Aurora's prow struck the Karankawa on that vessel's portside, at approximately five feet aft of its stem.

The repairs were completed and the Karankawa was available for libelant's use on October 5, 1944. The carpenter submitted and was paid his repair bill in the aggregate sum of $345.40, covering labor, $338.20 (should have read $336.20), and $7.20 expended by him for materials, over and above others supplied him by libelant, such as lumber, paint, etc., to the aggregate cost of $89.49, which includes $20 paid to have the lumber delivered to the work site. The total actual outlay by libelant was, therefore, no more than $434.04, although the libel claimed $450.08.

The defense questions said outlay and its expert witness Schmidt, of more than twenty-five years' experience and acquired skill in the construction and repair of exactly the same type of vessel as the Karankawa, positively testified that the repair work done on the damaged vessel should take one carpenter and two helpers nine eight-hour work days.

At the same rate of pay per hour charged by Montelongo, the carpenter in charge of the Karankawa's repair, or that is to say, $1.25 for the chief and 80 cents for the helper, the labor cost of the three workmen, for nine eight-hour work days, would be no more than $205.20.

Furthermore, according to Montelongo's testimony, at best, there was no work of any kind done on the Karankawa except during the period extending from September 14th to October 5th, excluding Sundays, or for nineteen days at the most. Some days as little as two hours' work was done; on others, never more than six hours. That was so, he explained, because he and his helper were then engaged in repairing several boats.

Giving libelant the benefit of the assumption that the repair of the Karankawa required the services of Montelongo and his helper for nineteen six-hour work days, at the claimed daily labor wage scales of $1.25 and 80 cents, respectively, or $2.05; as, substantially, the defense urges with reason, then the Montelongo bill calling for 164 work hours for himself at $1.25, and a like amount for his helper at 80 cents, was erroneous. Under the evidence, at best, there were but 114 work hours and libelant's labor cost should have been no more than $233.70. Only said amount and the proved sum of $96.69 (libelant's Exhibits 1 to 7, inclusive), which libelant expended for materials and delivery charges, should now be reimbursed him in order to make him whole for the repair damage sustained, or $330.39, in the aggregate.

The libel also first sought to recover for the claimed loss of use of the damaged Karankawa, during 35 days, at $100 per day, or $3,500. This represented a grossly exaggerated claim which, as such, should never have been made, and there is no justification, furthermore, for allowance of the now greatly-reduced claim of $1,927.80. Under the evidence, libelant is, however, entitled to recover $534, as hereinafter demonstrated.

It is established by the preponderance of evidence that libelant was regularly engaged in hauling, for Fabra Brothers, at Delacroix Island, La., freshly-caught shrimp, for which he received $2 per barrel freight, and that for such shrimp as he himself trawled for, while awaiting the fishermen's catches, his employers paid him the standard $14 per barrel price.

It is conceded that between August 20 and September 8, 1944, inclusive, he made five trips to and from the fishing grounds and hauled 331 barrels of shrimp, for which Fabra Brothers paid him $662, and that he sold them 31½ barrels of his own catch, receiving therefor $439.60.

Out of said aggregate gross receipts libelant, in keeping with the well-established custom of Louisiana fishing operations, had first to reimburse himself $100, representing each of the five trips' outlay for fuel and groceries, in the proved sum of $20; and then, the one-third part of the net remainder of $1,001.60 was paid the Karankawa's sole crew member, Nick Vuljan, as his hire, or that is to say, $333.86. Libelant, therefore, realized, net, $667.74 for the Karankawa's five trips, or at the average rate of $33.38 per day for the twenty-day period.

No evidence was adduced as to what, if any, was libelant's income from like operations of his vessel after its repair, but it was competent for him to attempt the establishment of the claimed loss of use of the

Karankawa in its customary operation, pending the effecting of repairs, by thus showing what were the conditions immediately prior to the collision.

The evidence, however, was definitely to the effect that whilst the damaged vessel was not fit for use from September 9 until October 5, 1944, or for a period of twenty-seven days, nevertheless, because of persistent squally weather between September 9th and the 20th, neither shrimp trawlers nor freight boats went out to the fishing grounds. Therefore, the Karankawa's lay-up during shrimping activities ran only from September 20th to October 5th, or a period of sixteen days. It appears reasonable to assume that had libelant been in a position to take out the Karankawa during said period, he would have realized, net, at least on the same basis as obtained during his previous twenty-day period of operations. On that basis, his net return would have amounted to no more than $534.08, as against the original claim of $3,500 set up by the libel but subsequently admitted to be inflated, inasmuch as libelant is not now claiming any more than $1,927.80.

In view of the foregoing considerations, and to relieve the parties from the necessity of complying with local Admiralty Court Rule 12, so that delay may be obviated, the Court does now make these following findings of fact and conclusions of law, viz.:

### Findings of Fact.

1. The faulty navigation of the motorboat Aurora was the sole proximate cause of the collision that occurred between it and the motorboat Karankawa, on the night of September 8, 1944, in Bayou Bell, St. Bernard Parish, Eastern District of Louisiana.

2. The Karankawa sustained damages by reason of being rammed by the Aurora and the fair cost of repairing the same amounted to no more than $330.39.

3. Because of persistent squally weather which immediately followed the date of the collision until September 20, 1944, all shrimp trawling and freighting ceased in the coastal waters, wherein the Karankawa customarily operated.

4. Libelant was deprived of the use of the Karankawa in its customary shrimp freighting and trawling operations, for a period of sixteen days from September 20 to October 5, 1944, and was thereby further damaged in the sum of $534.08.

### Conclusions of Law.

1. Libelant is entitled to recover from the Aurora and its owner, Fred Loje, damages in the aggregate sum of $864.47, so sustained by him as the proximate result of the hereinabove mentioned collision of the motorboat Aurora with his motorboat Karankawa.

Accordingly, the appropriate decree will be signed upon presentation.