Petitions of the **KINSMAN TRANSIT COMPANY**, as Owner and Operator of the **STEAMER MacGILVRAY SHIRAS**, and of the **Midland Steamship Lines, Inc.**, as Owner and Operator of the **STEAMER MICHAEL K. TEWKSBURY**, their engines, etc., for Exoneration from or Limitation of Liability, and Consolidated Cases.

**CARGILL, INCORPORATED** and **Cargo Carriers, Inc.**, Claimants-Appellants,

v.

**CITY OF BUFFALO**, Respondent-Appellee,

Continental Grain Company, Respondent-Appellee.

No. 132, Docket 30857.

United States Court of Appeals Second Circuit.

Argued Dec. 11, 1967.

Decided Jan. 18, 1968.

---

David C. Diefendorf, Buffalo, N. Y. (Raichle, Moore, Banning & Weiss, Buffalo, N. Y., of counsel), for claimants-appellants.

Edward J. Desmond, Buffalo, N. Y. (Anthony Manguso, Corp. Counsel, City of Buffalo, Desmond & Drury, Anthony Manguso, John E. Drury, Jr., Buffalo, N. Y., of counsel), for respondent-appellee, City of Buffalo.

Roy P. Ohlin, Buffalo, N. Y. (David S. Jackson, Ohlin, Damon, Morey, Sawyer & Moot, Buffalo, N. Y., Mendes & Mount, New York City, of counsel), for respondent-appellee, Continental Grain Co.

Before KAUFMAN, ANDERSON and FEINBERG, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The difficult question presented by this appeal is whether certain expenses incurred by claimant-appellants Cargill, Inc. (Cargill) and Cargo Carriers, Inc. (Cargo Carriers), as a result of an unusual concatenation of events on the Buffalo River during the night of January 21, 1959, are recoverable as a matter of law.

The misadventures leading to the catastrophe on the river that fateful evening were set forth when this litigation was previously before this court, 338 F.2d 708 (1964). For our purposes it is sufficient to state that as a result of the negligence of the Kinsman Transit Company and the Continental Grain Company the S.S. MacGilvray Shiras broke loose from her moorings and careened stern first down the narrow, S-shaped river channel. She struck the S.S. Michael K. Tewksbury, which in turn broke loose from her moorings and drifted downstream—followed by the Shiras—until she crashed into the Michigan Avenue Bridge.[1] The bridge collapsed and its wreckage, together with the Tewksbury and the Shiras, formed a dam which caused extensive flooding and an ice jam reaching almost 3 miles upstream. As a result of this disaster, transportation on the river was disrupted until approximately March 13, 1959—a period of about 2 months. Subsequent to our previous

---

[1]. The finding of negligence by the City of Buffalo in failing to raise the bridge was upheld by this court. 338 F.2d at 717–718.

adjudication of the negligence issues, Judge Burke appointed a Commissioner to determine the damages of the various claimants.

At the time of the accident, Cargill had some 336,000 bushels of wheat stored aboard the S.S. Donald B. Gillies berthed in the Buffalo harbor below the Michigan Avenue Bridge. (It is apparently not an uncommon practice for companies to "winter storage" wheat in this manner.) Cargill, it appears, was under contract to deliver 124,000 bushels of the Gillies' wheat during the period from January through March 1959. Because of the accident the vessel could not be moved to Cargill's grain elevators located above the collapsed bridge so that it could be unloaded. In order to comply with its contractual obligations, Cargill was required to secure replacement wheat in the Midwest.[2] The Commissioner allowed Cargill $30,231.38 for its extra transportation costs and $8,232 for increased "storage costs."[3]

Cargo Carriers' claim is somewhat different. When the calamity occurred it was in the process of unloading a cargo of corn from the S.S. Merton E. Farr at elevators located above the Michigan Avenue Bridge. Apparently the Farr was struck by one of the two free-drifting ships. Its cargo was undamaged but it broke loose from the dock at which it was moored. The by-product of this was that an ice jam formed between the Farr and the dock and normal unloading became impossible; the city fireboat and the harbor towing tugs which ordinarily would have broken up the ice jam were below the bridge wreckage and thus could not be of any assistance. The consequence of all this was that Cargo Carriers, which was under contract to transfer 10,322 bushels of the Farr's corn, was required to continue the ship's unloading with the aid of specially rented equipment. The Commissioner awarded it $1,590.40 for these incurred expenses.

Judge Burke refused to confirm either the Gillies or the Farr awards made by the Commissioner. He reasoned that the evidence established that the damages to Cargill and Cargo Carriers were caused by negligent interference with their contractual relations. In the absence of proof that the interference was intentional or with knowledge of the existence of the contracts, he concluded recovery could not be grounded in tort. Robins Dry Dock and Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). We too deny recovery to the claimants, but on other grounds.

We do not encounter difficulty with Judge Burke's analysis because it lacks some support in the case law; instead, we hesitate to accept the "negligent interference with contract" doctrine in the absence of satisfactory reasons for differentiating contractual rights from other interests which the law protects. The argument, frequently heard, that to allow recovery in such instances would impose a penalty far out of proportion to the defendant's fault or open the field to collusive claims and increased litigation, see Prosser, The Law of Torts, 964 (3d ed. 1964), which are the spectres commonly raised whenever the law extends its protection. Here, as elsewhere, the answer must be that courts have some expertise in performing their almost daily task of distinguishing the honest from the collusive or fraudulent claim. And, "[i]f the result is out of all proportion to the defendant's fault, it can be no less out of proportion to the plaintiff's entire innocence." Id. at 296. Moreover, several cases often cited as illustrations of the application of the "negligent interference with contract" doctrine have been

2. Respondent Continental Grain Company contends that Cargill could have availed itself of grain elevators below the Michigan Avenue Bridge to unload the Gillies. Because of our disposition of the case, we need not deal with this claim.

3. The wheat abroad the Gillies had been financed and the "storage costs" represented the accumulated interest for the period during which the wheat could not be utilized. In addition, in an award not contested on this appeal, Cargill recovered $9,790 for flood damage to its upriver installations.

convincingly explained in terms of other, more common tort principles. See 1 Harper and James, The Law of Torts, 505–10 (1956). Indeed, Professors Harper and James suggest that the application of the doctrine is wholly artificial in most instances. Id. at 501. We therefore prefer to leave the rock-strewn path of "negligent interference with contract" for more familiar tort terrain. Cargill and Cargo Carriers argue broadly that they suffered damage as a result of defendants' negligence and we will deal with their claims in these terms instead of on the more esoteric "negligent interference" ground.

Having determined our course, we nevertheless conclude that recovery was properly denied on the facts of this case because the injuries to Cargill and Cargo Carriers were too "remote" or "indirect" a consequence of defendants' negligence.

Numerous principles have been suggested to determine the point at which a defendant should no longer be held legally responsible for damage caused "in fact" by his negligence. See Prosser, supra, 282–329; 2 Harper and James, supra, 1132–61; Hart and Honoré, Causation in the Law, chs. VI and IX (1959). Such limiting principles must exist in any system of jurisprudence for cause and effect succeed one another with the same certainty that night follows day and the consequences of the simplest act may be traced over an ever-widening canvas with the passage of time. In Anglo-American law, as Edgerton has noted, "[e]xcept only the defendant's intention to produce a given result, no other consideration so affects our feeling that it is or is not just to hold him for the result so much as its foreseeability" Legal Cause, 72 U.Pa.L.Rev. 211, 352 (1924). E. g., Brady v. Southern Railway Co., 320 U.S. 476, 483, 64 S.Ct. 232, 88 L.Ed. 239 (1946).

When the instant case was last here, we held—although without discussion of the Cargill and Cargo Carriers claims—that it was a foreseeable consequence of the negligence of the City of Buffalo and Kinsman Transit Company that the river would be dammed.[4] It would seem to follow from this that it was foreseeable that transportation on the river would be disrupted and that some would incur expenses because of the need to find alternative routes of transportation or substitutes for goods delayed by the disaster.[5] It may be that the specific manner was not foreseeable in which the damages to Cargill and Cargo Carriers would be incurred but such strict foreseeability—which in practice would rarely exist except in hindsight—has not been required. Hart and Honoré, supra at 233.[6]

On the previous appeal we stated aptly: "somewhere a point will be

---

4. Continental Grain Company was held accountable even though exact developments were not a foreseeable result of its negligence because the very risks that rendered its conduct negligent produced injury to the class of persons to whom damage could be expected. 338 F.2d at 723–726.

5. In a claim not before us on this appeal, Judge Burke denied recovery to the Buffalo Transit Company for its expenses in rerouting its buses until a new bridge became available on the ground that its damage occurred only through "negligent interference with its right of user [sic]." Citing Robins Dry Dock, supra. He found that the defendants did not know that the transit company had a right to use the bridge. It would certainly not stretch the concept of foreseeability as it is developed in the cases to hold that it is "reasonably foreseeable" that buses use major river bridges.

6. We previously held that "all the claimants here met the Palsgraf [v. Long Island R. R., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928)] requirement of being persons to whom the actor owed a 'duty of care.'" 338 F.2d at 722. This passage is certainly applicable to Cargill's claim for flood damage to its upstream property. See fn. 3, supra. We need not decide which, if any, defendants owed Cargill a duty of care with respect to its unrelated claims based on the Gillies' immobility, since even if Palsgraf is satisfied, compensation may be precluded where—as here—the relationship between the negligence and the injury becomes too tenuous. See infra. We recognize that frequently identical questions are involved whether we speak in terms of

reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity." 338 F.2d at 725. We believe that this point has been reached with the Cargill and Cargo Carriers claims. Neither the Gillies nor the Farr suffered any direct or immediate damage for which recovery is sought. The instant claims occurred only because the downed bridge made it impossible to move traffic along the river.[7] Under all the circumstances of this case, we hold that the connection between the defendants' negligence and the claimants' damages is too tenuous and remote to permit recovery. "The law does not spread its protection so far." Holmes, J., in Robins Dry Dock, supra, 275 U.S. at 309, 48 S.Ct. at 135.[8]

In the final analysis, the circumlocution whether posed in terms of "foreseeability," "duty," "proximiate cause," "remoteness," etc. seems unavoidable. As we have previously noted, 338 F.2d at 725, we return to Judge Andrews' frequently quoted statement in Palsgraf v. Long Island R. R., 248 N.Y. 339, 354–355, 162 N.E. 99, 104, 59 A.L.R. 1253 (1928) (disssenting opinion): "It is all a question of expediency * * * of

fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

Affirmed.[9]

---

"duty" or some other standard for determining where recovery should be denied. Prosser, supra at 283.

7. The claim of Cargo Carriers is the more troublesome of the two because the Farr was struck by either the Shiras or the Tewksbury and where there is physical damage to a vessel the owner can recover for the loss of its use until repairs are completed. The Aurora, 64 F.Supp. 502 (E.D.La.), aff'd, 5 Cir., 153 F.2d 224 (1945); 1 Harper and James, supra at 503, n. 4. But apparently Cargo Carriers has not sought recovery for physical damage to the Farr. And, as we understand the facts, the Farr could have been unloaded without additional expense were it not for the fact that the tugs which ordinarily are used to break up ice jams were caught below the Michigan Avenue Bridge.

8. Although to reason by example is often merely to restate the problem, the following illustration may be an aid in explaining our result. To anyone familiar with N. Y. traffic there can be no doubt that a foreseeable result of an accident in the

Brooklyn Battery Tunnel during rush hour is that thousands of people will be delayed. A driver who negligently caused such an accident would certainly be held accountable to those physically injured in the crash. But we doubt that damages would be recoverable against the negligent driver in favor of truckers or contract carriers who suffered provable losses because of the delay or to the wage earner who was forced to "clock in" an hour late. And yet it was surely foreseeable that among the many who would be delayed would be truckers and wage earners.

9. Cargill and Cargo Carriers contend that Judge Burke had ruled at a hearing in 1963 that they would be permitted to recover their damages and that this ruling became the law of the case. Even if we were to agree with this interpretation of the trial judge's ruling, the "law of the case" doctrine permits a change of position if it appears that the court's original ruling was erroneous. Southern Ry. Co. v. Clift, 260 U.S. 316, 43 S.Ct. 126, 67 L.Ed. 283 (1922); 1B Moore's Federal Practice ¶¶ 0.404 [1] and [4].