**EASTES et al. v. SUPERIOR OIL CO. et al.**

No. 3019.

District Court, W. D. Louisiana, Lake Charles Division.

April 12, 1946.

C. A. McCoy and Alvin O. King, both of Lake Charles, La., for libelants.

Thos. F. Porter and Thomas L. Raggio, both of Lake Charles, La., for respondent Superior Oil Co.

John D., M. A. & Edwin H. Grace, of New Orleans, La., for D. M. Picton Co., Inc.

PORTERIE, District Judge.

Libelants claim from respondents, Superior Oil Company, and D. M. Picton Towing Company, Incorporated, in solido, damages in the sum of $8,039.63, with 5% per annum from November 7, 1943, until paid, as damages to their motor boat, named Tramp, resulting from its sinking, caused by its running onto a submerged piling near the dock of the Superior Oil Company located in the Gulf of Mexico about one mile offshore and about twelve miles east of Calcasieu River Pass.

By an amended complaint libelants claim additionally $1,000 for attorney's fees.

The liability of the Superior Oil Company is based on its negligence in placing and leaving this piling in the Gulf hidden and submerged, and that of D. M. Picton Company is next connected because it had contracted with the Superior Oil Company to remove this piling from the Gulf, and that it had negligently failed to do so, leaving it as a hazard to navigation.

The defense of Superior is a denial that the Tramp sank as a result of striking any submerged piling; then, in the alternative, it prays that if judgment be against Superior and Picton in solido, satisfaction of the judgment be first had from Picton, and then, further in the alternative, if judgment be rendered against it, a judgment in the same amount be rendered in favor of it against Picton for the latter's failure to comply with its contract to remove all the piling.

Picton answered the libel on the merits, denying liability, admitting the contract

with Superior to remove certain piling, but that if a piling had caused the damage to the Tramp, it was not a piling that it had agreed to remove. Further, in its answer it alleged that the contract it had with Superior was under the inspection and approval of Superior.

Picton's defenses, more itemized, are: That libelants were not parties or privies to the contract between Picton and the Superior; that Picton had completed its contract and left Superior's premises nearly three years before the alleged damage; that Picton's work under the contract had been performed, accepted by Superior, and paid for, and accordingly, Picton owed no duty to libelants, and the libel against it should be dismissed; that if libelant sustained damage as alleged in the libel, it was sustained as the result of its being upon the Superior's premises as an invitee and in the performance of a service for the benefit of the Superior, and that Superior owed to libelant the duty of seeing to it that the premises were safe for such use by libelant; that Picton was relieved of furnishing a bond to indemnify Superior should Picton fail to fully comply with its contract, and accordingly, that now Picton can not be brought in by Superior to stand in its stead; in other words, that it was not in the contemplation of the parties that Picton should be held so responsible; that a court in admiralty is without jurisdiction to pass upon the contract between Picton and Superior, because a contract to remove piling is non-maritime and for that reason the petition for a judgment filed by Superior against Picton should be dismissed; and that libelant seeking to recover damages for injuries alleged to have been sustained through the fault of another, has failed to discharge the burden of proof resting upon it to prove negligence and that on that ground the libel filed should be dismissed as to both defendants.

We should rule immediately on the point directed to the jurisdiction.

The drilling platform is some fifteen miles out, in the Gulf of Mexico, and the following provision is extracted from the written contract:

"That all of the salvaged material will be delivered either upon barge or dock at Lake Charles, Louisiana, as designated by this company * * *."

It is admitted that items of machinery, steel tanks, in the aggregate weight of over one hundred tons, were transported by sea and inland water.

We conclude that Picton's contract to remove piling and transport by boat the machinery that it salvaged from the water was a maritime contract. 1 Benedict, Section 66, p. 137; Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 135 F.2d 443.

Furthermore, even if Picton's contract with Superior was not a maritime contract, there is jurisdiction in admiralty to permit Picton to be impleaded under the circumstances of this case. Evans v. New York & P. S. S. Co., D.C., 163 F. 405, 407; The Thomas F. O'Brien, D.C., 26 F.2d 674; The Alert, D.C., 40 F. 836; Soderberg v. Atlantic Lighterage Corporation et al., 2 Cir., 19 F.2d 286; Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612. Admiralty Rule 56, 28 U.S.C.A. following section 723.

As this case was tried by us over a year ago, in order to be sure that none of its facts and legal principles be omitted, we have read the full transcript, as well as the three able briefs by the three firms, and have re-examined, of necessity, all of the maps and exhibits.

The main defense made by both respondents is that the libelants have not proved their case with that legal certainty that is necessary to sustain a judgment; in other words, the libelants have failed to sustain the burden of proof resting upon them of proving negligence.

In most cases of this character in admiralty, the fact of collision is clearly established and is beyond debate, but in this case it is a matter of circumstantial evidence, and there is a necessity for a full discussion.

In their favor, we have to admit that libelants begin with three fully proved facts in the record:

A. That the Tramp, after backing but a short distance, bobbing up and down three to four feet in a heavy sea, for one reason or another, suddenly and immediately sank —a matter of, at most, five minutes.

B. Within two days thereafter, upon a search of the sea bottom in the vicinity of the sinking, using a bridle, there was located a submerged piling lying at an angle of 45 degrees, pointing north to the shore, whose tip was just submerged about three to three and a half feet below the level of the water.

C. Some few days after the sinking of the Tramp, at first chance to see, when work for its towing and salvage was in progress (on the second day), a hole in the bottom of the boat, caused clearly by a piercing force from the outside, about ten by twelve inches in size, was found a little back of center.

The exact location of this piling was determined to be 142 feet northeast of the northeast corner of the burned platform area; then, from the scaled map, it would be about 150 feet from the point the Tramp began to back out to the point that it allegedly had its bottom pierced by the submerged piling. We shall consider in seriatim the various defense theories offered as against the contention of libelant that it was this submerged piling that caused the disaster.

1. There was first the theory that the seacocks of the Tramp were open and that brought about the sinking. This had origin in the fact that the Tramp had come near sinking once, before this disaster, and once again, after its repair, from the open seacocks. The evidence on these two occurrences is clear that it would take a good period of time, at least half an hour or more, for the Tramp to have sunk from the open seacocks. In the two noted instances, they were found to be open after a half-hour, or more, of running, and there was no damage or sinking. There is not an item of proof from the skipper and the two passengers of the boat that the cocks were open. The defense theory of open seacocks causing the sinking is totally unacceptable.

2. The next theory of the defense is that in the salvage of the boat from its lodgment in the soft mud, there are numerous circumstances arising at different times, during the towing of two days, which would attribute the hole in the bottom of the boat to other causes than that of the bobbing boat in rough weather being pierced by the piling. The various circumstances offered on this score are:

(a) In the vicinity of where the boat sank was an area where, in the removal of the burnt piling by the Pictons, the work was done by the breaking off of the piling by lateral force; there were left pieces of each piling, as proved, in the mud bottom. Then, as the boat lodged itself in the mud, its bottom would have rested on an unremoved fragment of piling and, because of the weight of the boat and the movement of the boat caused by the action of the water, there would be a piercing of its bottom. This theory absolutely falls, because, as the Tramp left its mooring that day, all the evidence, direct and circumstantial, is that it backed out in a northeasterly direction (all the eye-witnesses say this). It is uncontroverted that the boat unloaded its one passenger and took a new one at the northeast corner of the Superior's platform; that there was a strong northwesterly wind blowing which made it inescapable that the Tramp, not only by its own power, but because of the force of the elements, was pushed eastwardly and sank, according to all witnesses (and, also, by where it was found and salvaged) totally away from an area where there had ever been any piling. So, conclusively, it could not have rested on top of old piling.

(b) The next theory offered by the defense to explain the hole in the bottom of the boat is that in the various efforts at its salvaging, made by tow barge with derrick, in the placing of the slings underneath the belly of the boat to lift it, or as the boat was hoisted and carried at times out of perpendicular, the bottom could have hit some projections or corners of the carriers, or (and this was more strictly urged), when the towing barge stopped overnight at the Coast Guard Station out of Cameron, when the La Salle, another helping

boat, was pushing the outfit toward shore so that the bow of the Tramp could be beached, the forward sling of the three used broke, and the bow of the Tramp dropped and sank into four or five feet of water, and that its stern remained up. There is one witness who says that all of the attachments to the Tramp practically loosened because of the manner that the slings were joined at one point (in that if one sling loosened, the others had to in some degree, also), but the strong preponderance of the evidence is that the stern of the Tramp did not so sink at that time as to have been pierced in its bottom by imaginary pilings at that spot. The evidence is clear that the bow of the Tramp did rest on the shallow beach, and that immediately offshore the water is fourteen feet deep. These facts preclude even the thought that the stern was fully loosened, for the rear end of the boat would have gone to the bottom and all of the boat would have slid back. It is true that the boat had water over the deck, but the whole cabin was out, and the stern of the boat was held higher up than the bow. So, we can by no means say that the Tramp's bottom was pierced at that place, for the rear end of the boat never touched, or even came near, the bottom. There is no evidence either, that any submerged piling was there.

(c) There is another theory: That in three successive laps of towage, meaning here each effort took one day, there were times when the keel of the Tramp scraped the bottom of the channel and that the piercing of its bottom could have occurred then. There is no evidence at all in the record to warrant such an assumption.

(d) Likewise, we can not give any support to the suggested theory that the Tramp damaged itself and brought about its immediate sinking by her pounding against the piling cluster at the mouth of the slip whilst discharging one passenger and taking on another. There are three eye-witnesses, the two passengers and Skidmore, and not one gives any facts from which could in any way be deduced that the pounding (testified to as a period of about two minutes) could have caused the disaster.

Therefore, we conclude as a matter of fact that, by the clear preponderance of the evidence, the Tramp was pierced by the piling that was found shortly after the disaster, extracted from the sea, and a part of which was objectively brought to court.

The circumstances that make this conclusion clearly preponderant are: That when the Tramp moved out from the platform, it was in the direction of the piling, and there was a sea, quite rough, with waves of about four feet in height, causing the boat to bob up and down like a cork; that the boat moved the short distance out to the submerged piling of 150 feet in order to make sure that it could navigate safely away from the platform; that though Captain Skidmore at the time (some witnesses say he admitted it) was not fully aware of the cause of the sinking of his boat, he could not hear any piercing noise because of the noise of the wind and the flapping of the waves against the side and rear of the boat. The piercing noise had to come from under the water, anyway.

As to the physical shock to, or shaking of, the boat, which a number of competent witnesses say an expert seaman, such as Skidmore was, should have noticed, we have on that point the evidence of the lone person with Skidmore on the boat, the picked-up passenger, who says at page 400 of the transcript of evidence, in answer to the court's question: "What happened? You heard no noise, or anything?"

"The Witness: Well, when he backed up and stopped his motor it sounded like he hit something and I asked him—I said, 'Skidmore, I believe you hit something', and he said he sure did, but I didn't pay any attention to what it all was at the time. I knew he just killed his motor.

"The Court: And then it began to sink?

"The Witness: That is correct."

Besides, the raging sea tossed the light boat so that the piercing of a board one and a half inches thick, and the breaking of a two by four inch rib, both thirty-three

years old, by a relatively sharp piling, was not specially noticeable.

Mr. Skidmore, the skipper of the Tramp (and he has impressed us favorably), says:

"* * * as I was backing up into these heavy seas, and I was drifting and I backed it about 150 feet, probably 200 feet, northeast, and something *hit the back end* and my motor stopped again. So I told this boy that was with me, I says, 'It looks like I am having trouble here.' * * * When it happened it naturally felt like a sharp sea hit me, or slapped the back end and killed the motor."

It is true that others say, "At the time he did not know exactly what happened," and "No more than we asked him what was the matter, and he said he didn't know at that time."

It is significant, however, that Skidmore the next day got away to Cameron, the nearest village, called the owner of the Tramp at Houston, went back within two days to the scene of the disaster, in a hired boat with crew, and one of the owners (nothing could be done on that visit because of the roughness of the sea); then went again in another hired boat with crew and the owner, within a day or two, locating the sunken boat again, and checking to determine what to do; then went a third time in a third boat with a full crew, one of the owners, and a diver, and that was the day of the construction of a bridle—being made of a pipe twenty feet long tied at each end and dragged from the stern of the boat—which located the submerged piling.

Here is the colloquy from the record:

"Q. You pointed out the point where to try to look to find it? A. I did.

"Q. Did you find it anywhere near the place that you designated that it might be? A. Yes sir, almost on the spot."

The above story proves that Skidmore, from beginning to end, felt that something had pierced the bottom of his boat, and he located the submerged piling before the Tramp was ever lifted from the bottom, carried away, and on the second or third day of towage to Lake Charles, the hole ten by twelve inches was found.

The conclusion would be just as confirmatory, though not as strong, if the dragging for the piling had been brought about by the finding of the hole in the bottom.

It is very probable, from an examination of the piling by many witnesses in court, and the admitted fact that the propeller and guard of the Tramp showed damage, that the Tramp in backing struck the submerged piling practically in line with its inclination (the Tramp was backing toward the shore obliquely, and the piling was located underneath the water inclining squarely toward the shore), and, firstly, the sliding of the guard and propeller across the piling caused the damage shown on them; then, secondly, the boat slid further over the piling to the time where the pressure from the bobbing weight became so strong that the piling pierced the bottom. The evidence discloses a scraping just before the piercing.

All of this happened quickly, the distances are short, and the next force of the water upwards took the Tramp off the piling. The quick and immediate sinking of the Tramp can only be explained by the hole in its bottom; therefore, the hole must have been made at that place and by the piling.

Therefore, we repeat that the conclusion aforestated is fully and preponderantly supported by all the circumstances.

It is true that there are inconsistencies in the position taken by Superior at first, through its initial pleading, and next through answers, particularly to interrogatory 11, subdivisions e and f, and the position it took finally after it had its case fully prepared for the trial. Because of accomplishing substantial justice, there was no bar to the shift of the position of Superior; none was actually made orally, or filed in writing. If any had been made, we should have overruled.

There is evidence in the record that two guy pilings, showing above water some eight or ten feet, and burned some at the top, remained untouched after the completion of the Picton contract, but the evidence is that the two guy pilings were totally removed by Superior in October

of 1942, with no bottom and left stuck in the mud. They came at issue in the case because of their former location; they were northeasterly from the cluster of piling where the Tramp picked up its passenger, and only 100 feet away. Furthermore, as a clincher, the dragging by the libelants, and again the dragging by the Superior, over the whole area disclosed nothing submerged—remnants of these two guy pilings or anything else—except the piling previously mentioned.

■ It is true that, as a matter of law, it is the fairer and better practice, when surveys and drags of this character are made, or when soundings are taken, all interested parties should be present. In the instant case, it is true that libelants made their own measurements and dragging, etc., but they have produced at the trial every one of the persons present. All testified as to what they knew of the towing and salvaging of the Tramp from the time it left the mud bottom to the time it got to the shipyards at Lake Charles. Also, the Superior used its engineers and employees to drag the bottom, make surveys and take measurements, and no one else was invited to be present. But, it also brought into the Court all the witnesses and they were placed under cross examination, etc. Picton was never invited to be present. We are abundantly and preponderantly satisfied, however, that the evidence as received should be accepted, even though Picton had no representative present at the time the observations were made. The rule is that such invitation is important and proper in admiralty practice; however, we cannot destroy this strong evidence as submitted. See the Westchester, 2 Cir., 254 F. 576.

The next important question in the case is to determine to whom does the piling belong, and when and how it came to be there, and how left there.

The piling is one of those put there by the Superior Oil Company when it established its platforms for the handling of oil coming from offshore oil wells that it has in this area. It is one of the pilings that supported its tanks in the extreme northeast corner of its original development. It is a piling in an area that the Superior did not re-develop or reconstruct with new piling and platform after the fire caused by lightning had razed its former installation.

It is established with mathematical certainty by competent engineers of Superior, and uncontradicted by anyone, that this piling, buoyed first by Skidmore and his party when first found, then pulled out and salvaged by the Superior later, is one of those that was originally in the installation at that point, and was one of those which was under contract by Picton to be removed.

■ Superior immediately becomes liable for this disaster upon this proof, because it could not leave such a dangerous hazard to navigation lying around, and so near, within 142 feet, of its present re-installation. So it has to be held first liable to the libelants for whatever items of damages are to be developed later in this opinion.

The next important and difficult question to decide is whether or not the Pictons in turn become liable to the Superior and over to the libelants.

Superior, in the year 1941, contracted with Picton to remove all pilings, submerged or otherwise, which were a part of Superior's platform, adjacent to its drilling platform, and which had been damaged by fire and lightning. Picton performed this work promptly; there was no inspection by Superior of the premises; that is, by any of its upper employees except that one, O'Neil, pumper and gauger for Superior for many years at this platform, seemed to have been interested during the whole work because he stayed all day on Picton's dredge boat during the time of piling removal and machinery salvaging. The work was paid for by Superior as if it were acceptable. O'Neil now says, three years later, that the steel craft of the Pictons would push these pilings over (the pilings, set in straight lines, showed here and there because they had burned to the level of the water), and that he knew one was left then and there, but had never reported it to his employer. He never did think of the heavy wind and heavy seas

of the day that the Tramp had to navigate slightly out of the ordinary for its own safety, and did back into this piling.

It is very natural for a person like Mr. O'Neil, a good man, you know, who is out there at this spot way out in the water, alone and by himself, to exercise considerable authority. The employing corporation has no one else there but him. Anyone who comes to the platform looks upon him as the one in authority. It is but the expected, since the checking of the runs of oil and the gauging of the tanks does not require constant attention, that he should have found inviting pleasure in being on the Picton boats all the time that they were doing the work.

The best proof of O'Neil's exercise of authority, whether vested or not, is the fact that Skidmore, Captain of the Tramp, was employed with his boat by O'Neil to make the trip from Cameron to the Superior's platform in the Gulf, a distance of about fourteen miles, to bring an employee of Superior to the spot, and pick up another whose time was over and bring him back to Cameron. Superior in its answer has not denied O'Neil's authority in that employment, and this fact in the case is one of the several links through which we hold Superior liable for the disaster to the Tramp.

We have to decide from these facts and circumstances just how much O'Neil may additionally bind the Superior and absolve Picton.

On the point that O'Neil, an employee of the Superior, saw the piling in question above water one time during January, 1945, which was after the accident to the Tramp, in out opinion could not bind Superior to the exclusion of Picton. We cannot subscribe to the theory that what O'Neil saw during the winter months of a particular year, when the tide was especially low, could or should have been seen by him before the accident to the Tramp. Such being the fact, we must deny the contention of Picton that it should be exonerated on this score.

Three or four of the other witnesses in the case who were continuously present in the area of the drilling platform either after or during the several years involved, testify that they never saw this submerged piling before or after the accident. Under these circumstances we cannot exonerate Picton's neglect of having left a submerged piling which it was obligated under contract to remove.

The fact that O'Neil, after the date of the Tramp's sinking, told his employer, the Superior, that he had seen the Picton barge smash down a piling just as they were about finishing the contract—the time being November of 1941, and the Tramp sank November 7, 1943—raises the question as to whether or not his knowledge in his character of chief pumper and gauger was the knowledge of his employer, the Superior. If it would be so, then it follows that Superior was in continued neglect from that day of November, 1941, and that this type of negligence would exonerate Picton's negligence, who presumably was in good faith and uninformed as to the status, either directly or indirectly.

The superintendent, the one in charge of operations down at Cameron for Superior, testifies clearly that O'Neil had no authority to inspect the work of Picton under its contract. He was to take care of the oil wells and machinery at the platform. The superintendent admits that if O'Neil saw any dangerous condition and would report it to him that he would go out there and verify the situation and, if necessary, have it corrected. To the question, "It would be a part of his duties to report it to you, would it not?", the superintendent answered, "I guess it would, yes."

Giving due weight to all of these circumstances, we still hold that Superior, a corporation, cannot be prevented from bringing in Picton to answer for Picton's original fault.

O'Neil's authority must be held to its scope of taking care of the oil wells and machinery. If he saw a fault of Picton's and for one reason or another believed at the time that it was not much of a dangerous hazard, never reported it, let it escape his mind, we cannot see how that can absolve Picton from its original

obligation of proper performance in the removal of all submerged piling.

We conclude that O'Neil is basically an employee of the Superior. In his function as chief pumper and gauger at the drilling platform, isolated out at sea, there naturally developed the apparent or ostensible authority to employ the Tramp to bring to and take away from the platform necessary employees in the work of pumping and gauging. But at no time did conditions arise whereby the Superior made of O'Neil its agent to the degree that he could accept a completion of the Picton contract for the removal of submerged piling. Consequently, too, because of his fundamental position as an employee, his knowledge of how pilings were just pushed over by the Picton barges, and perhaps one left underneath the surface of the water cannot be imputed as the knowledge of the corporation employer. 2 C.J.S., Agency, §§ 102 to 105, both inclusive.

■ The craft of libelants was invited to the premises by the Superior to do work on that particular stormy day, so there can be no debate as to Superior's liability. It is more liable from this fact than if the Tramp had merely been independently cruising in the area. This intensified liability of Superior, however, is no excuse for Picton.

Picton avers that O'Neil's (the agent's) knowledge of the presence of submerged piling is the knowledge of Superior (the principal), who either had actual knowledge of the presence of submerged piling on their premises, or is charged with such knowledge. Further, Picton avers that since Superior invited libelant to come to its platform and for its purposes, it is charged automatically with the knowledge of this hazard to navigation. Norfolk Tidewater Terminals v. Wood Towing Corp., 4 Cir., 94 F.2d 164.

■ Picton makes the further defense that the Superior accepted the work of removing the damaged piling, paid the price as agreed upon by contract, and continued to use the premises practically three years before the accident to the Tramp occurred.

Picton advances that, after Superior said it was satisfied with the work done, it removed its equipment from their premises, and that Picton had no possession or control over the premises subsequently.

In addition to that, the point is advanced that it was not in the contemplation of the parties that Picton was to be responsible to Superior for damages resulting from Picton's improper completion of contract.

Picton urges further that, as shown by the testimony of record, it had completed its contract with Superior, and liability to libelants occurring thereafter is the liability of Superior and not the liability of Picton.

None of the above contentions may excuse Picton from the proper performance of its contract. It left a hazard to navigation which was its contractual duty to remove. Evans v. Western Timber & Logging Co., 9 Cir., 201 F. 461; Philadelphia, Wilmington & Baltimore RR. Co. v. The Philadelphia & Havre de Grace Steam Towboat Co., 23 How. 209, 64 U.S. 209, 16 L.Ed. 433; Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890; Pier Machine Co. v. Schooner Fannie F. Hichey, 1931, A.M.C. 794 at page 797 and 798; The Rickmers, 9 Cir., 142 F. 305, 309; The Baltimore, 8 Wall. 377, 385, 75 U.S. 377, 19 L.Ed. 463; The Atlas, 93 U.S. 302, 307, 23 L.Ed. 863; 15 C.J.S., Collision § 194, p. 219; 15 C.J.S., Collision, § 195, p. 220.

■ One who is deprived of his boat through the fault of another and who is thereby prevented from making the profits he would have made during the time necessary to salvage, repair, and re-equip the boat, is entitled to compensation for the lost time, with interest until paid. The Conqueror, 168 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937; The North Star, 2 Cir., 151 F. 168; The James McWilliams, 2 Cir., 42 F.2d 130; Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co., 2 Cir., 98 F.2d 694; The Potomac 15 Otto 630, 105 U.S. 630, 26 L.Ed. 1194.

■ So, judgment in solido must be given in favor of libelants as prayed for; but we also must give judgment in turn in

favor of Superior against Picton in the like amount.

 Now, we must fix the amount of the judgment. The salvaging cost of $2879.24, and the cost of repairs and re-equipping at the shipyard (unproved items deducted) of $3451.41, were fully proved. The issue is drawn, however, on the facts and on the law as to the item of $1250, representing the loss of the use of the boat for a period of ten weeks during the shrimping season.

(a) The amount of catch and profits depends upon luck, weather, and various uncertain and speculative conditions, not susceptible to proof, and (b) the shrimp business of libelants was not an established one, are the two main objections made by respondents against the above allowance. The record will show that on the same day one boat might catch $1000 worth of shrimp, and another boat only $100 worth. One witness said:

"The shrimp is in spots out there, and you have to hit them, where they are, in order to pick them up. The fellow who brought in the most shrimp was lucky enough to get over where they were and find lots of them. The fellow who did not bring in many perhaps didn't get over the shrimp, and didn't find them. He is liable to move over from where he starts, after he finds he is picking up nothing, and get in another spot and pick up 6 or 7 hundred dollars worth at one time."

The Tramp was originally designed as a shrimping boat, was purchased to be used as such, and had just recently been prepared and equipped for catching shrimp commercially. It was employed that one fateful day just because the weather was too bad for shrimping. Skidmore was an experienced shrimp boat captain; the Tramp lost ten weeks during the very best shrimping season. The evidence is that all boats were successful and made at least twice more during the period than the amount now claimed of $1250. A disinterested witness, familiar with the local geography, engaged in the shrimping business during the very year at issue, testified that the shrimping during the time the Tramp was disabled, was especially good, and on the specific question answered:

"Well, that boat should have earned between 4,000 and $5,000 in those two months compared with boats of the same size and with the same nets, the same capacity, and the same power. * * * Well, Louis Hood had the Sea View and the Sea Coleen, and those 2 boats made the best catches. I believe in 8 days they paid him $6,400."

The expert witnesses on shrimping admit that the catch is dependent upon the weather, and upon the element of chance as to cruising in good spots, and also upon application; but the evidence clearly preponderates on the point that all boats catch substantially of shrimp during a period of time such as is involved here—ten weeks. It is hardly possible that the Tramp could have missed hitting a couple of moving schools of shrimp.

 A proctor's fee of $100 is allowed the libelants, U.S.C.A., Title 28, Section 826.

So, judgment will be signed upon presentation in the total amount of $7680.65.