THE MARGARET J. SANFORD.

PARTRIDGE v. THE MARGARET J. SANFORD.

(Circuit Court, S. D. New York. December 1, 1888.)

1. COLLISION—VESSELS AT BULK-HEAD—OBSTRUCTING CHANNEL.
   The ship T. moored at a bulk-head with her bow projecting about 16 feet into a canal 157 feet wide, leaving sufficient space for vessels to pass. Afterwards a bark moored at a bulk-head on the other side, with her bow projecting so far into the canal that it would be difficult for vessels to pass between. The S., with a car-float in tow, and in an unfavorable condition of the tide, attempted to pass between the vessels, and collided with the T. Held, that the T. was also in fault in remaining in her position after the bark moored on the other side, and the damages should be divided.

2. SAME—DAMAGES—DETENTION OF VESSEL.
   The T. was a "tramp" steamer, occasionally visiting the port of New York, and was under a charter for a voyage to Bombay, under which she would have earned, above expenses, $,.0 per day. The charter stipulated for demurrage at the rate of £45 per day, while it appeared that the customary allowance at the port of New York for detention of vessels the size of the T was $262 per day. The vessel had no engagement beyond the immediate voyage, and it was not shown that after her arrival at destination she found immediate employment. Held, that neither the demurrage rate specified in the charter, nor the customary demurrage rates at the port of New York, supplied a satisfactory criterion of the loss sustained by the vessel's detention during repairs; that the amount of the consequential loss was the difference between the market value for the use of the vessel or her probable net earnings during the period of detention; and one way of ascertaining this was by finding what she was earning at the time, or immediately before and after the collision; and that if at the time she was employed under a charter for a long period of time, the average daily earnings under the charter may be taken as the criterion.

In Admiralty. Libel for damages. On appeal from district court. 30 Fed. Rep. 714.

*Wilhelmus Mynderse,* for appellant.

*R. D. Benedict,* for appellee.

WALLACE, J. The steam-ship Tantallon was lying at a bulk-head at the Empire Oil-Works, Hunter's Point, East river, March 31, 1885, taking in a cargo of oil. Her bow projected about 16 feet across a canal 157 feet wide, which ran from the river between the premises of the Empire Oil-Works and the Standard Oil-Works. The bulk-head on the other side of the canal was 70 feet further out into the East river, and at this bulk-head lay an Italian bark, also projecting partly across the canal; her stem some 30 feet, and her bowsprit 30 feet further. The bark took her position after the Tantallon was moored. About noon the steamer Margaret J. Sanford, with a loaded car-float lashed on her port side, consigned to the Standard Oil Company, attempted to enter the canal. In doing so the port bow of the float struck the starboard bow of the Tantallon, inflicting injuries which were repaired at the expense of $700, and which also necessitated a delay of seven days in the loading of the steamer, detaining her that time beyond the lay-days provided for in her charter. This suit was brought to recover for the damages thus sustained by the Tantallon. The district court held both the tug and the steam-ship in fault, and divided the damages, and allowed no damages for the detention of the Tantallon beyond the expense of wages and maintenance of her crew and wharfage. The owners of the Tantallon have appealed.

It is plain upon the evidence that the attempt of the tug to pass between the two vessels upon the tide as it was then, incumbered by a heavy and unwieldy float, was one which could not be made with prudence unless the tug had the extra assistance which her master called for, but was unable to obtain. Her master was aware of the risk of attempting to pass between the two vessels by which the entrance to the canal was obstructed, but preferred to encounter it, hoping doubtless to be able to avoid collision with either, rather than subject himself to the inconvenience of abandoning temporarily the undertaking in which the tug was engaged. The case, as regards contributory fault on the part of the Tantallon, does not turn upon the question whether she was originally culpable in taking a position in which she unnecessarily projected a few feet across the entrance of the canal. Probably, until the Italian bark took a position on the other side of the entrance, projecting still further across the entrance, there was sufficient room left for access to the canal for tugs with floats, and for all the purposes of the ordinary navigation of the place; but after that the entrance was obstructed to such an extent as would necessarily embarrass the movements of tugs with tows, and measurably interfere with their access to the canal in the usual course of traffic. When this became apparent, the Tantallon was not justified in remaining in her previous position, even though until then it was a proper one. There was plenty of room, and nothing in the way, to per-

mit her to be moved astern. She cannot be exonerated merely because after she had taken her position the vessel on the opposite side of the entrance ought not to have taken the position she did. It was then that the probable danger of the situation should have been foreseen, and obviated in the exercise of ordinary care; and the Tantallon cannot excuse her own omission to do this because the peril of the situation was primarily attributable to the misconduct of the other vessel. The Tantallon must be deemed in fault because at the time of the collision she was assisting in an unnecessary obstruction of the canal, which impeded and complicated the movements of the tug and float. The case falls within the rule laid down in *The Canima*, 23 Blatchf. 165, 32 Fed. Rep. 302, and many other authorities, which it is unnecessary to cite.

By the decree of the district court the libelant was allowed, besides one-half of the cost of the repairs of the steamer made necessary by the collision, one-half of $375.55 for consequential loss. That sum represents the amount of the port expenses of the Tantallon during the seven days she was detained by repairs. Nothing was allowed by way of demurrage. The Tantallon was an English "tramp" steamer that occasionally visited the port of New York. She was under charter for a voyage to Bombay when she was injured, and was at the time being loaded for the voyage. She would have earned freight under this charter, above expenses, of about $70 per day for the time ordinarily occupied in loading, sailing, and discharging. The charter stipulated for demurrage at the rate of £45 per day. She had no engagement beyond the immediate voyage, and there is nothing to show that after she arrived she actually found employment at Bombay within seven days. After she reached Bombay she engaged in the coasting business for a time, and then returned to England. It appears by the testimony of a witness for the libelant that "the customary and usual amount to allow for detention for steamers for the class and size of the Tantallon" at the port of New York was 20 cents a ton; being, for the Tantallon's tonnage, $262 a day. The libelant also gave testimony to show what the Tantallon could have earned upon a return voyage from Bombay to New York, and it appears that if she could have got a cargo immediately, both at New York and Bombay, she could have earned for the time ordinarily occupied by the round trip about $140 per day net freight.

It was held in this court by Mr. Justice NELSON (*The Hermann*, 4 Blatchf. 441) that the charge for lay-days in the charter-party under which the vessel is employed at the time of a collision furnishes no test to determine the damages for her detention during the time of her repairs. Upon this authority the stipulated rate of demurrage in the Tantallon's charter must be rejected as evidence of her actual loss by detention. It is not necessary to decide in the present case what effect should be given to the demurrage rates which prevail at a particular port, either by the regulations of a maritime exchange, or by the general recognition and acquiescence of the mercantile community, as evidence of the amount of loss by detention. In a case where that port is the place, or one of the places, at which the vessel is commonly employed,

such rates would afford a criterion, and in some cases perhaps the best practically attainable, of the value of the lost use of the vessel while she is detained there. But such evidence is certainly not conclusive, and it is so often misleading that it should not be given controlling weight when better evidence can be supplied. The present case well illustrates the unreliability of such evidence, because it appears by the testimony introduced by the libelant that under the most favorable circumstances, and with constant employment, the Tantallon could only earn about $142 per day above expenses. The disparity is so great between any actual loss which could possibly arise by her detention, and the hypothetical loss indicated by the demurrage rates, that the latter are of no value whatever as evidence. If it had appeared that the steamer was under a charter to return to New York, her intended voyage to Bombay and the return voyage could be treated as a round trip, and an allowance for her detention upon the basis of her average daily earnings above expenses for the round trip might have been awarded. As it is, there is really no satisfactory evidence of the value of the use of the vessel during the period of her detention except such as is derived by computing her average daily earnings above expenses upon the basis of the freight by the charter under which she was employed at the time. It is a reasonable presumption that if she had not been detained seven days she would have fulfilled her engagement, and earned the freight stipulated by the charter in seven days less time. If the Tantallon could have discharged her cargo at Bombay seven days earlier than she did, she might or might not have found other employment immediately; but however this might have been, it is plain that she was obliged to devote seven days more to earning the freight than she would if she had not been detained by the collision. Her daily earnings during the period of her engagement were reduced proportionally.

Some of the authorities, and some of the decisions of this court, have commented upon the difficulty of ascertaining the consequential loss resulting from the deprivation and use of a vessel in collision cases. Thus it was said in *The Rhode Island*, 2 Blatchf. 114, that "the precise amount, or even a reasonable approximation to it, cannot be ascertained by the application of any known or fixed rule." Nevertheless it is not apparent why the same rule, and why evidence of the same character, should not be adopted in the solution of the inquiry as are resorted to when the owner of other kinds of property seeks compensation for the damages caused by the wrongful interruption of its use. If the owner of a horse, or a mill, or machinery, or a house, is temporarily deprived of his use of the property by the wrongful act of another, the law implies consequential loss as a necessary and proximate result, and allows a recovery for the value of its use as a proper item of damages, and permits the value to be shown by the opinion of witnesses conversant with the subject. *Parker* v. *City of Lowell*, 11 Gray, 353; *Allen* v. *Fox*, 51 N. Y. 562; *Sutchwell* v. *Williams*, 40 Conn. 371. In the large commercial ports the value of the hire of a vessel can as well be ascertained as that of most other kinds of property used for business purposes. As the question is one for the

opinion of experts it is very likely to be involved in considerable contradiction of estimates, but this is an objection which applies whenever a question of market value or usable value arises. The injured party is not necessarily confined, in proving his consequential loss, to the amount of the market value of the use of his vessel during the time of detention. Even where the loss arises from breach of contract the rule is that the party injured is entitled to gains prevented, as well as losses sustained, provided they are certain, and such as might naturally be expected to follow the breach, (*Railroad Co.* v. *Howard*, 13 How. 307; *U. S.* v. *Behan*, 110 U. S. 338, 4 Sup. Ct. Rep. 81; *Griffin* v. *Colver*, 16 N. Y. 489; *Waters* v. *Towers*, 20 Eng. Law & Eq. 410;) and the rule in torts is *restitutio in integram*, (*The Cayuga*, 14 Wall. 270.) When the vessel is employed at the time of the collision, or when it appears that she would have been beneficially employed during the period of her detention, it is entirely clear that actual loss has attended the interruption of her engagements. *The Clarence*, 3 W. Rob. 283; *Williamson* v. *Barrett*, 13 How. 101; *The Rhode Island*, 2 Blatchf. 114; *The Cayuga*, 7 Blatchf. 385. In the present case, therefore, the inquiry is merely one as to the amount of the loss, and that is to be resolved by ascertaining the market value of the use of the vessel, or her probable net earnings during the period of her detention, by the best evidence attainable. One way of ascertaining this is by ascertaining what she was earning at the time, or immediately before and after the collision. This is certainly *prima facie* evidence of her earning capacity, and sufficient to require the wrong-doer to show that she was temporarily earning more than usual. As was said by Dr. LUSHINGTON in *The Gazelle*, 2 W. Rob. 279: "If the settlement of the indemnification be attended with any difficulty,—and in these cases difficulties must and will frequently occur,—the party in fault must bear the inconvenience." See, also, *The Star of India*, 35 Law T. (N. S.) 407. When there is no other satisfactory evidence of her earning capacity than is shown by the charter under which she was employed at the time, and that charter contemplates her employment for a long period, the average daily earnings under the charter may be taken as the criterion. The general subject is well considered upon authority and principle in the opinion of Judge LONGYEAR in *The Mayflower*, 1 Brown, Adm. 376. For these reasons $70 per day would seem to be a fair equivalent for the actual loss. It follows that an allowance for demurrage in the sum of $490, besides the amount of the port expenses, should be included in the damages to be divided. A decree is ordered for the libelant conformably with these views. The libelant is entitled to interest on the damages from April 7, 1885, and to the costs taxed by him in the district court. The costs of this appeal are awarded to the libelant.