**THE GYLFE   v.   THE TRUJILLO.**
No. 62, Docket 22801.

United States Court of Appeals
Second Circuit.

Argued Nov. 13, 1953.
Decided Jan. 6, 1954.

Kirlin, Campbell & Keating, Washington, D. C., Raymond T. Greene and Ira A. Campbell, New York City, of counsel, for appellant.

Haight, Deming, Gardner, Poor & Havens, New York City, Charles S. Haight and Richard G. Ashworth, New York City, of counsel, for appellee.

Before SWAN, FRANK and MEDINA, Circuit Judges.

SWAN, Circuit Judge.

This litigation arose out of a collision on the high seas on May 14, 1948 between two foreign registered vessels. The libel, filed in January 1950, was brought by a Norwegian corporation, owner of the motor tanker Gylfe, a Norwegian flag vessel bound from Aruba,

Dutch West Indies, to a port in Denmark. The other vessel, the steam tanker Trujillo, flew a Panamanian flag but was owned by a Delaware corporation, the appellant. In October 1950, pursuant to a settlement stipulation, a consent decree was entered adjudging that the libelant recover 90% of its provable damages, with interest at the rate of 6% per annum on the various items thereof, and referring the cause to a special commissioner to ascertain and report the amount of the damages. Exceptions to the commissioner's report were overruled by Judge Clancy without opinion, and the final decree confirming it is now before us for review.

Following the collision, the Gylfe returned to Aruba for temporary repairs and thereafter proceeded on her voyage. Various stages of permanent repairs were effected in Norway, Sweden and Denmark. Expenses necessarily incurred as a result of the collision were paid by the libelant in foreign currencies and at various dates. By stipulation there was submitted to the commissioner, among other questions, the rate of exchange to be used in fixing in United States currency, libelant's damages recoverable as a result of such expenditures. The foreign currencies had depreciated between the dates of the expenditures and entry of the final decree on March 25, 1953. In what we regard as a thoroughly considered and able report on this subject, the commissioner, Mr. Mark W. Maclay, held that the rates of exchange to be used were those prevailing when the expenditures in foreign currencies were made. Using these rates he determined the amount in dollars the libelant was entitled to recover for collision repairs. The appellant does not attack the amount as so computed, but contends that the rates prevailing on the judgment-day should have been used. This presents the first question for decision.

■■■■ We entertain no doubt that the commissioner ruled correctly. The damages recoverable by an injured party from a tortfeasor are determined by the law of the place where the tort was committed.[1] If a collision occurs in territorial waters of the United States, the rights and duties of the parties are governed by our law;[2] if it occurs in British territorial waters, by British law.[3] Here the collision occurred on the high seas; hence the rights and duties are created by the general maritime law as interpreted and applied by the law of the forum, of which it is a part.[4] According to the general maritime law as applied in our courts the loss occurs when the tort is committed, and the injured party's claim is for the amount of that loss valued in our money at that time.[5] The appellant's duty to pay the appellee such sum as would make good the loss sustained by reason of the tort continues until satisfied by payment. Although the amount to be paid was not immediately ascertainable, it became a definite sum as soon as the expenditures for necessary repairs were made by the appellee. Had the tortfeasor made payment forthwith, as was its duty, the calculation of the sum payable in the United States in dollars would have been at the rates of exchange then prevailing.[6] The commissioner's ruling that

1. Restatement, Conflict of Laws, § 412.

2. The Verdi, D.C.S.D.N.Y., 268 F. 908, 909.

3. Shaw, Savill, Albion & Co. v. The Fredericksburg, 2 Cir., 189 F.2d 952.

4. Hawaiian-Larchgrove, D.C.S.D.N.Y., 1935 A.M.C. 809; Quevilly-Sampson, D.C.S.D. N.Y., 1938 A.M.C. 347; see also Restatement, Conflict of Laws, § 410.

5. See cases cited in the three preceding notes, supra; also Pennsylvania R. Co. v. Downer Towing Corp., 2 Cir., 11 F. 2d 466, 467; Hicks v. Guinness, 269 U.S. 71, 80, 46 S.Ct. 46, 70 L.Ed. 168.

6. See Det Forenede Dampskibs Selskab v. Insurance Co., 2 Cir., 31 F.2d 658, 659: " * * * when a sum is payable in the United States in dollars, any conversion from foreign currency necessary to its calculation is to be made at the exchange prevailing at the due date."

those were the proper rates to use in this case is supported both by logic and by authority. We think it also produces a just result. Why should the wrongdoer benefit from his delay in performing his duty to make reparation? It is fairer to put the risk of fluctuation of foreign exchange on the tortfeasor than on the innocent injured party.

The appellant argues that the judgment-day rule produces a more just result than the breach-day rule; that had the libelant sued in Norway it would have obtained a judgment stated in kroner which the appellant could satisfy by sending dollars sufficient to purchase the number of kroner specified in the judgment; and that the result of applying the breach-day rule "penalizes" it and brings a "windfall" to the libelant solely because it has elected to sue in the United States. There is nothing in the record to indicate that the libelant could have obtained jurisdiction over the Trujillo or its owner in any other form than the one chosen. But if it could, and if the judgment-day rule were applied, the result would be to give a "windfall" to the appellant because of its delay in satisfying an obligation which concededly arose when the tort was committed and became definite in amount when the cost of repairs was ascertained. As already indicated we think the innocent injured party a more worthy recipient of a "windfall" than the tortfeasor. Nothing to the contrary is to be found in our recent decision in Shaw, Savill, Albion & Co. v. The Fredericksburg, 2 Cir., 189 F.2d 952, upon which the appellant strongly relies. As Judge Frank pointed out at page 955 of 189 F.2d that case involved "a foreign tort, a collision in British territorial waters. Accordingly, cases relating to collisions in our waters or on the high seas are inapposite." The same page of the opinion quotes with approval the following statement in 40 Harvard L.Rev. 619, 625:

" 'Conversely, where a tort occurs in the forum, but where damages must be reckoned in terms of foreign money, the right to reparation is expressed in the money of the forum at the date the cause of action arises, and hence the rate of exchange existing on such date should prevail.' "

In the case at bar, it is true, the tort occurred not "in the forum" but on the high seas. But since the general maritime law which governs the rights and duties of the parties is part of the law of the forum, the situation is analogous to a collision in American waters, and the same rule as to foreign exchange should be applied.

The second question raised by the appellant relates to the award of damages for loss of use of the Gylfe during the detention period caused by the collision. The parties stipulated that the Gylfe suffered delays on the voyage and during collision repairs totaling 36 days, 20 hours and 27 minutes. The commissioner held that the proper measure of damages for loss of the use of the vessel is the average per diem net profits of the collision voyage, the preceding voyage, and the subsequent voyage, stipulated to be $2,193 per day, plus the agreed constant cost of $500 per day. Applying this measure of damages the loss of profits was $80,816.62 and the lay-up expenses were $18,426.03. Interest on these sums at the rate of 6% from July 13, 1948 (date of completion of repairs) to August 22, 1952 (date of the commissioner's report) was added, making a total of $123,713.46, and libelant was held entitled to recover 90% of the damages so figured.

The appellant does not dispute that libelant is entitled to recover as part of its damages the value of the use of the Gylfe lost to it by delay resulting from the collision, if adequately proven.[7] But it contends that the libelant has not sustained the burden of proof. It argues

---

7. The Conqueror, 166 U.S. 110, 125, 17 S.Ct. 510, 41 L.Ed. 937; The Glendola, 2 Cir., 47 F.2d 206, 208; Aktieselskapet Bonheur v. San Francisco & P. S. S. Co., 9 Cir., 287 F. 679, 682. In the case last cited the court observed with respect to

(1) that the evidence does not show with reasonable certainty that the Gylfe would have been profitably employed, and (2) that if she is entitled to any detention damages the rate of daily profit should be less than that found by the commissioner.

■ Upon all the evidence, consisting solely of exhibits, the commissioner found that "there was a charter market for tankers of the Gylfe's general type," and "that there were profitable charters available during the period in question and that the opportunity to use the Gylfe would probably have been availed of by her owner." We think no error was committed in overruling the respondent's exception to these findings. It appears that it was the practice of the libelant to keep the Gylfe continuously employed. The voyage immediately preceding the collision voyage began on February 22, 1948 and ended April 10. The collision voyage under a charter party dated March 23, 1948, began April 21 and ended June 15. Collision repairs were completed on July 13, 1948, and on the same day the Gylfe proceeded on her next voyage under a charter party dated June 24. But for the delay caused by the collision she would have been available for a voyage to start on June 9, 1948. Prior to the collision on May 14, 1948 the libelant was negotiating for a charter party under which the voyage could have begun on June 9 and have been completed on July 30. These negotiations were discontinued upon receipt of information that the collision damage would make it impossible for the Gylfe to meet the desired date. It also appears

from exhibit B that the Norwegian Shipowners Association received no notices of lay-ups during 1947 and 1948 and was of opinion that no ships were laid up during these years because of lack of business. Other exhibits show schedules of actual fixtures for voyages from the Caribbean to Scandinavian ports during May to August 1948 inclusive. The appellant's criticism of these exhibits does not convince us that the commissioner's findings were clearly erroneous.

■ More persuasive is the appellant's argument that the commissioner adopted too high a rate of daily profit. Since there was a market for tankers of the Gylfe's type and the libelant would probably have availed itself of the opportunity to charter her the problem is to determine what the vessel would probably have earned during the detention period. Frequently this may be proved by taking the mean of her specific earnings shortly before and after the period of delay.[8] As shown by the cases, the courts have evolved the so-called "three-voyage" rule. But this is not a rule of thumb to be invariably applied. In Quevilly-Sampson, S.D.N.Y., 1938 A.M.C. 347, 357 the commissioner ignored the voyage preceding the collision voyage because the rate for that voyage was fixed under an old charter at what was concededly far below the prevailing charter value of the vessel. Consequently he based the allowance on the average net earnings of the collision voyage and the one immediately following. There the market price was rising; here it was rapidly declining. The Gylfe's pre-collision voyage was under a charter party dated Jan-

the burden of proof: " * * * and, as anticipated earnings of the vessel cannot always be certainly ascertained and definitely proven, it suffices if they are proven circumstantially and with a reasonable degree of certainty." Similar language is contained in The North Star, 2 Cir., 151 F. 168, 175: "It is not necessary for him to show by direct evidence that he would have employed his vessel or his property during the period in such a way that earnings would have accrued to him. In many cases this would necessitate proving his intention at the time,

and this might be impossible. It suffices if he shows a state of facts from which a court or jury can find that there was an opportunity for him to do so, and that he would probably have availed himself of it."

8. Roscoe, Damages in Marine Collisions (3rd ed.) 97; The James McWilliams, 2 Cir., 42 F.2d 130, 133; The Margaret J. Sanford, C.C., 37 F. 148, 152; Sugar Products Co. v. Mobile & Gulf Nav. Co., 5 Cir., 268 F. 815, 817; The Europe, 9 Cir., 190 F. 475, 482; The Tremont, 9 Cir., 161 F. 1, 2.

uary 13, 1948 which specified a freight rate of $25 per ton. The charter party dated March 23, 1948 under which the collision voyage was made fixed the rate at $17 per ton. In the negotiations in May 1948 for the proposed charter, the freight rate offered was $13.23 per ton and the owner's counter offer was $15 per ton. In the post-collision charter party dated June 24, 1948 the freight rate was $7.55 per ton. In a market so rapidly declining we think that including the pre-collision voyage exaggerates the probable loss of profits during the detention period. That this is so is demonstrated both by the negotiations in May 1948 for the proposed charter and by the profits actually made on the collision voyage and the post-collision voyage. The stipulation shows that had the libelant accepted the offeror's bid for the proposed charter the Gylfe would have made a profit of $1433 per day on the proposed voyage. This is very close to the average daily net profit of $1405 earned on the collision and post-collision voyages. It is highly probable that the offeror's bid would have been accepted in view of the falling market, if no higher offer could be obtained. We think the commissioner should have used the rate of $1433 per day in determining what the vessel would have earned during the detention period.

The appellant argues that it is pure speculation to assume that the libelant would have accepted the offer of the proposed charter at a freight rate less than its counter offer. It relies upon the case of Cuyamel Fruit Co. v. Nedland, 5 Cir., 19 F.2d 489. That case is distinguishable. There the vessel was unemployed at the time of the collision, and there was a rising market so that the owner might gain by refusing acceptance of the offered charter. Here the facts are just the reverse. The Gylfe was kept constantly employed, the market was falling and her owner accepted a much lower hire for the post-collision voyage. That the offer fairly represented her market value during the detention period was corroborated by her actual earnings on the collision and post-collision voyages. On this record we believe the inference is justified that but for the collision she would have been chartered at the best rate available.

Accordingly the decree is affirmed as to the award for collision repairs but is reversed as to the award for loss of use during the detention period and the cause is remanded for recomputation of damages in conformity with the views expressed in this opinion.