**MOORE–McCORMACK LINES, Inc., as charterer in possession of THE WILLIAM S. HALSTED, Libellant,**

v.

**THE ESSO CAMDEN, Standard Oil Company (N. J.), Claimant.**

United States District Court
S. D. New York.

March 29, 1956.

Rehearing Denied May 2, 1956.

---

Burlingham, Hupper & Kennedy, New York City, Adrian J. O'Kane and Richard W. Palmer, New York City, of counsel, for libellant.

Kirlin, Campbell & Keating, New York City, Raymond T. Greene, New York City, of counsel, for claimant.

WALSH, District Judge.

Both parties have excepted to the report of the Commissioner, Thomas H. Middleton, Esq., fixing damages due as a result of a joint fault collision between their vessels. All other matters having been stipulated, the items in controversy relate to damages for detention of both vessels and the recovery by the libellant of certain general average disbursements.

The collision occurred in Chesapeake Bay on November 2, 1946. The Halsted was outward bound from Baltimore for the Baltic, the Camden inbound for Baltimore from Baytown, Texas, and Sewell's Point, Virginia. After the collision the Camden proceeded to Baltimore and discharged her cargo. She was then detained for 17 days, 23 hours, and 41 minutes for repairs due to the collision. The Halsted returned to Baltimore where she was delayed 17 days for collision repairs. She then carried out the voyage to the Baltic on which she had been engaged at the time of the collision.

The exceptions are overruled.

### The Halsted's Award

Libellant was charterer in possession of the Halsted. The record contains little as to her commitments at the time of collision or her actual loss of profits with respect to the collision voyage. A stipulation merely recites that at the time of collision she had sailed on a voyage to Baltic ports "which said voyage was duly carried out after collision repairs had been effected".

The Commissioner computed her detention damages on the basis of the estimated average daily earnings she could have commanded at the time of collision. In constructing this estimate he averaged the daily net profit of the collision voyage as subsequently completed, $1,227.06, with the daily net profit of the pre-collision voyage, $1,156.35. He refused to take into account the daily net profit of the post-collision voyage which was only $413.26. The collision voyage and the pre-collision voyage were made to the Baltic during the winter coal trade. Upon the vessel's return from the collision voyage this trade was no longer available and her next trip was to South America at a less profitable rate.

### A. Exceptions by Claimant.

■ Claimant contends that under the rule of The Gylfe v. The Trujillo, 2 Cir., 209 F.2d 386, 388 and Quevilly-Sampson, 1938, A.M.C. 347, 350, the Commissioner should have estimated the vessel's loss of profits as of the period when she was

next available for new employment.[1] It argues that this would have been the period beginning when the collision voyage would have been completed but for the collision. It further urges that in the absence of proof that Baltic trade would still be available, the lower profits of the South American trade should have been used as a basis for the Commissioner's estimate.[2]

■■ To recover damages for detention it must be established first, that profits have actually been lost, and second, the amount must be proven with reasonable certainty. The Conqueror, 166 U.S. 110, 125, 17 S.Ct. 510, 41 L.Ed. 937. Yet, the Commissioner may not speculate as to the loss of voyage profits caused by the detention; he may only allow a per diem rate based upon the charter rate for comparable vessels, or, if such evidence is not available, upon the owner's record of earnings of the detained vessel about the period of detention. The Apollon, 9 Wheat. 362, 376, 6 L.Ed. 111; The Conqueror, supra, 166 U.S. at pages 125–127, 17 S.Ct. 510.

■ No case referred to by counsel has limited damages to the daily rate the vessel would earn when next actually available for hire although several have taken into account post-collision charter rates in an effort to calculate what rates the vessel could have earned if she had been free for new employment during the period of actual detention. Even in

The Gylfe v. The Trujillo, supra, and Quevilly-Sampson, supra, relied upon by the claimant, this was done.[3] The vessel does not recover her actual earnings lost but rather the estimated charter hire she could have earned if free for new employment at the time of detention. Her actual earnings, present, past or future, are merely a basis for constructing this estimate of detention period charter rates. The James McWilliams, 2 Cir., 42 F.2d 130, 133.[4]

Although this rule has its arbitrary aspects, an attempt to speculate as to what the detained vessel would have actually earned if her collision voyage had not been prolonged would usually involve so many contingencies that proof would be cumbersome and the result uncertain. To be fair it would be necessary to recognize the converse of the claimant's contention, that if but for the delay due to a collision the libellant's vessel could have made a third trip to the Baltic, then she should not recover only for her seventeen days' detention based upon the daily average profit of such a voyage, but rather she should receive the difference in total voyage profit between a voyage to the Baltic which she lost and a voyage to South America which she was required to accept in its place. This is the very type of speculation which The Apollon condemned.

■ The Commissioner therefore properly based detention damages upon

---

1. At the time of the collision, the vessel was not under charter, as in the case of the detained vessel in both of the cited cases. Nevertheless, the cargo with which she was already laden was ultimately carried to its destination. As to any profits actually lost on the collision voyage, libellant had the burden of proof. The only evidence is the stipulation that the collision voyage was "duly" carried out. This must be taken to mean as planned and without loss of cargo.

2. Claimant's contention that there was a failure of proof by libellant is misconceived. No proof was offered because the Commissioner held it irrelevant. If damages should have been based upon the period for which it contends, it would be necessary to remand to the Commis-

sioner to take proof as to whether the Baltic trade would have then been available.

3. In The Gylfe v. The Trujillo, supra, 209 F.2d 386, the court said: "* * * the problem is to determine what the vessel would probably have earned during the detention period. * .*.. * " 209 F.2d at page 389. On page 390, of 209 F.2d, it speaks of "* * . * the probable loss of profits during the detention period. * * * "

4. "* * * The earnings of the dredge are relevant, not because the libelant is entitled to recover lost profits, but as a basis for estimating the charter hire of such a dredge and as a substitute therefor." 42 F.2d at page 133.

the charter hire a comparable vessel could have obtained if free for new employment during the period of her detention. He correctly declined to compute these rates for the period commencing with the originally scheduled termination of the collision voyage.

In estimating the vessel's potential charter rates during the period of her detention, a great variety of estimates have been used, not only the three voyage rule (pre-collision, collision and post-collision voyages) referred to in The Gylfe v. The Trujillo, supra, 209 F.2d 386, 389; The Tremont, 9 Cir., 161 F. 1, 2, but also many others depending upon the nature of the business in which the vessel was employed.[5] In The Gylfe v. The Trujillo, and Quevilly-Sampson, the courts were confronted with rapidly changing charter markets and the charter rates under which the vessel was actually employed on the collision voyage gave no fair guide as to what she would earn if re-employed during the period of detention. In The Gylfe v. The Trujillo, the court awarded damages based upon the rates proposed for a prospective voyage, the charter for which was under negotiation at the time of collision. In Quevilly-Sampson, supra, the Commissioner averaged the collision and post-collision voyages in an effort to compute

her potential charter rate during the detention period not, as contended by claimant, to determine what she could earn at the end of the collision voyage.[6]

■■ In the present case the Commissioner was not confronted with a changing charter market, but rather the problem of a vessel engaged in a seasonal trade.[7] There was very little fluctuation between her earnings on her first Baltic voyage and the second, the collision voyage. These were the vessel's only two voyages in that service, the service for which she would have been available at the time of collision. Therefore he computed her probable earnings for this period by averaging these two voyages. Her earnings in the South American trade did not reflect a general decline in charter hire but the earnings available for a different type of work, work completely unrelated to that in which she was engaged, and apparently could have been re-engaged at the time of collision. The judgment of the Commissioner in such a matter is not to be set aside unless clearly erroneous. Here, it was not.

■ Claimant also excepts to the Commissioner's allowance of certain items of general average disbursements as part of libellant's collision damages. It is conceded that such disbursements are generally recoverable. Corning-Isa-

5. The Europe, 9 Cir., 190 F. 475, 482. The court computed damages on the basis of the average earnings of a river vessel on voyages for the preceding five years.

Societe Des Voiliers Francais v. Oregon R. & Nav. Co., D.C.Or., 178 F. 324, looked to its average net earnings for five 333–334. To compute detention damages for an ocean going vessel, the court years preceding the lay up.

P. Dougherty Co. v. City of New York, D.C.E.D.N.Y., 52 F.Supp. 397, 398, affirmed 2 Cir., 142 F.2d 556. To compute detention damages for a barge, the Commissioner looked to its average earnings on four voyages preceding and one following the detention.

The Aurora, D.C.E.D.La., 64 F.Supp. 502, 505, affirmed Loje v. Protich, 5 Cir., 153 F.2d 224. To compute detention damages for a shrimper, the court looked to its average earnings for approximately two weeks prior to the lay up.

Eastes v. Superior Oil Co., D.C.W.D. La., 65 F.Supp. 998, 1006–1007, affirmed 5 Cir., 160 F.2d 189. To compute detention damages for a shrimper, the court looked to the average earnings of similar vessels during detention period.

See Roscoe, Damages in Marine Collisions, 2d Ed., 1920, p. 100 et seq.

6. See also The James McWilliams, 2 Cir., 42 F.2d 130, 132, wherein the Commissioner's recommendation was rejected because based solely upon the earnings of the contract in effect at the time of collision, which had been in effect for 405 days, with no proof that the detained vessel could have obtained employment at such rates if she were available during the period of detention.

7. Loss of the advantage of seasonal trade may be proven. See Roscoe, Damages in Marine Collisions, 2d Ed., p. 101.

bella, S.D.N.Y.1928, A.M.C. 1495; Corning-Gulf of Mexico, S.D.N.Y.1924, A.M.C. 932. These disbursements include:

(a) Commission on general average disbursements and sacrifices at 2%    $  312.80

(b) Interest on general average disbursements and sacrifices from dates of outlay or loss to March 31, 1952, at 6%    5,296.99

(c) Settling agent's commission; commission for collecting and settling the general average, at 2½%    592.04

Claimant argues, that the claim for interest on these disbursements made by libellant should be disallowed because the libellant, as ship charterer, was itself a 65% contributor to the general average fund, and is to that extent really recovering interest on collision damages although it was one of the parties at fault [8] and that this is contrary to the rule of Canadian Aviator, Ltd. v. United States, 2 Cir., 187 F.2d 100; and The Wright, 2 Cir., 109 F.2d 699, 702.[9]

Interest on general average disbursements is an allowance for the use of the shipowner's funds advanced in the common interest of ship and cargo. The partial coincidence of the amount so allowed with the interest on the ship's collision damages should not be permitted to confuse these two concepts. In theory, the shipowner would be entitled to the same amount of collision damages whether he took prompt action to resume the interrupted voyage or not, his damages being reduced to the extent

he failed to minimize them. It is to encourage him to lay out new capital and resume the voyage promptly that interest is allowed on his general average disbursements. This policy should not be embarrassed by a generalization that this allowance must be reduced by the percentage of the hull's liability to the general average fund. The policy of Canadian Aviator, Ltd. v. United States, supra, and The Wright, supra, is a factor which must be considered in deciding whether general average situation is artificial, but each case should be left to the Commissioner to be decided upon its own particular facts. The contention was presented to the Commissioner and his conclusion not being clearly erroneous, should be affirmed.

B.  *Exceptions by Libellant.*

Libellant claims that in addition to the detention damages allowed, it is entitled to its insurance costs during the period of detention. Although there is authority that insurance costs should not be deducted as an expense incident to a particular voyage,[10] precedents amply support the Commissioner's conclusion that this item be disallowed as a detention expense. Sinclair Refining Co. v. The America Sun, 2 Cir., 188 F.2d 64, 67; The Tremont, 9 Cir., 161 F. 1; The Baltimore Maru, 5 Cir., 11 F.2d 836, 838, certiorari denied Kawaski Zosensho v. Cosulich Societa Triestina Di Navigazione of Trieste, 265 U.S. 581, 44 S.Ct. 456, 68 L.Ed. 1190; Isthmian S. S. Co. v. Jarka Corp. of Baltimore, D.C.Md., 100 F.Supp. 856, 862. The Corning-Gulf of Mexico, 1924, A.M.C. 932, and The Corning-Isabella, 1928, A.M.C. 1495, cited by libellant as authority for the

---

8. The facts are that the libellant advanced the funds necessary for general average disbursements. The general average fund was collected by the general average underwriters from the cargo underwriters and the hull underwriters. The total amount was $807,631.28 of which the hull underwriters contributed $525,038.57. Thus approximately 65% of the interest recovered by the libellant was paid by the hull underwriters.

9. Cargo, of course, is always entitled to recover its damages including general average disbursements and interest thereon from the tort feasor. The Energia, 2 Cir., 66 F. 604, 608; Canadian Aviator, Ltd. v. United States, supra, 187 F.2d 100.

10. Roscoe, Damages in Marine Collisions, 2d Ed., p. 101.

allowance of insurance premiums during detention, relate to premiums specially incurred on cargo stored ashore after the collision. Similarly, The Quevilly-Sampson, 1938, A.M.C. 347, concerned war risk insurance which was of no benefit to the vessel while undergoing repairs.

### The Esso Camden's Award

The Camden was owned by the claimant, Standard Oil Company, and chartered to claimant's wholly owned subsidiary, The Standard Oil Company of New Jersey. Under the terms of the charter, claimant lost charter hire for the eighteen day period of detention. After deducting an amount representing two days' hire for time consumed on repairs not resulting from the collision, the Commissioner awarded the Camden an amount equal to sixteen days gross charter hire less stipulated daily expenses which would have been incurred if she had been in operation during this period.

### A. *Exceptions by Libellant.*

Libellant's principal objection is to the use of the charter rates as a basis for detention damages. It contends that claimant and its subsidiary must be regarded as a single organization and that damages must be computed as though the claimant was using its vessel for the transportation of its own products. Under such circumstances, the basis for recovery would not be charter rates unless a substitute vessel were hired. It would be necessary to develop some other basis to show the loss of profits which claimant sustained by being deprived of the use of the vessel. Brooklyn Eastern Terminal v. United States, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240; Sinclair Refining Co. v. The America Sun, 2 Cir., 188 F.2d 64; The Glendola, 2 Cir., 47 F.2d 206, 208. On the other hand if claimant and its subsidiary may properly be regarded as separate entities, the charter rates furnish the best measure of damages. Agwilines, Inc., v. Eagle Oil & Shipping Co., 2 Cir., 153 F.2d 869, 870–871; M. & J.

Tracy, Inc. v. Tug Rowen Card, D.C., 116 F.Supp. 516, 1953 A.M.C. 1700, 1710, affirmed D.C.E.D.N.Y., 116 F.Supp. 523, 1953 A.M.C. 2045. See Sabine Transp. Co. v. S. S. Esso Utica, 1955 A.M.C. 2102, 2106; Del-Mar-Va-L.S.T. 389, D.C.Va., 1945 A.M.C. 1332, 1346–1353. The Commissioner found that libellant's assertion that the subsidiary was incapable of dealing freely with its parent was not proven. Accordingly he based detention damages upon the contract between them. This finding is sustained by the record. The two witnesses who testified on this issue admitted that claimant exercised control over broad policy matters affecting the development and exploitation of the holdings of its subsidiaries but they maintained that, in the execution of these broad policies, the subsidiaries and affiliates dealt independently with each other and with claimant.

Whether corporate identities of affiliated corporations should be respected or not has received frequent attention by the courts. See Taylor v. Standard Gas & Electric Co., 10 Cir., 96 F.2d 693, 704–706, reversed on other grounds, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669; Berkey v. Third Avenue Railway Corp., 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599. Here we are not concerned with an attempt to evade liability for an act of a subsidiary. Cf. Weisser v. Mursam Shoe Corp., 2 Cir., 127 F.2d 344, 145 A.L.R. 467. The Commissioner was merely looking for a satisfactory measure of damages. The only question was whether the charter was so artificial that it could not serve this purpose. Although the subsidiary might well not be sufficiently independent to bargain with its parent in the sense of threatening to give its business to someone else, the charter rates were in line with or lower than the current market and the dealings between parent and subsidiary showed consistent respect for their separate identities. Under the circumstances, the Commissioner was justified in not putting claimant to the more difficult type of proof required in the case of a ship used exclusively to carry her owner's cargo. See Sabine

Transp. Co. v. S. S. Esso Utica, 1955 A.M.C. 2102, 2107; Del-Mar-Va-L.S.T. 389, D.C.Va., 1945 A.M.C. 1332, 1346–1353; and Pocahontas S. S. Co. v. S. S. Vacuum, 1944 A.M.C. 1385, 1387.

■ Libellant also claims that the Commissioner erred in failing to deduct 96 hours of the detention on the ground that the charterer was liable to the claimant for that amount of charter hire. Claimant relies upon the language of clause 8 of the charter which reads as follows:

> "8. In the event of loss of time from breakdown of machinery, regular overhaul of hull or machinery, collision, stranding, fire or other accident or damage to the Vessel, preventing the working of the Vessel for more than 96 consecutive hours, payment of hire shall cease until the Vessel is again in an efficient state to resume her service \* \* \*".

The language of this clause does not sustain libellant's contention. Ninety-six hours measures the period of breakdown necessary to cause hire to cease. The clause does not provide that in the event of a longer breakdown, the charterer must pay for the first 96 hours thereof, nor are clauses of this nature generally so construed. See Robinson, Admiralty, 1939 Ed., p. 629; Meade-King, Robinson & Company v. Jacobs & Company, 19 Com.Cas. 380, aff'd. 20 Com.Cas. 288.

■ Libellant also contends that inasmuch as the Camden was scheduled for owner's repairs in Galveston, the six days required for the voyage from Baltimore to Galveston should be deducted from the detention time. This contention is baseless. The Camden was not returning to Galveston for repairs; she was returning there to pick up a new cargo from a Gulf port; her plan to undergo repairs in Galveston was only incidental to this purpose.

Libellant's exceptions to the Commissioner's allowance to the Camden are overruled.

### B. Exceptions by Claimant.

■ The Commissioner deducted from the gross charter hire of the Camden an amount stipulated to be the expense she would have sustained had she been able to continue with her voyage as scheduled. Claimant contends that it was entitled to an allowance for wages, provisions and fuel during the period of detention.[11]

■ The Commissioner properly disallowed this claim. He reasoned that inasmuch as he was allowing the Camden her gross charter hire during this period and only deducting the expenses stipulated as those which would be incurred on the voyage she was forced to cancel, the balance included all expenses not related to the voyage itself. Accordingly, to allow the expenses of her maintenance would involve a duplication. His conclusion was fairly drawn from the stipulation of the parties. Claimant failed to prove the amount of wages, provisions and fuel required during detention as distinguished from those required for full operation. If in fact the stipulation submitted to the Commissioner was actually inaccurate for this reason or because it stipulated that the claimant would be liable for certain charges actually for the account of the

---

11. Shipowners have frequently been permitted to recover, as an item of detention damages, necessary maintenance expenses incurred during the detention period, on the theory applied by the Commissioner to the Halsted; that is, that these expenses must be added to the net profit in order to make the shipowner whole in respect to the loss of use of his vessel. The James McWilliams, 2 Cir., 42 F.2d 130, 133; The Detroiter, D.C.S.D.N.Y.1948, A.M.C. 349; Connolly v. United States, 1950 A.M.C. 1778; The Tremont, 9 Cir., 161 F. 1; and see Interlake S. S. Co. v. 251,000 Bushels of No. 2 Mixed Corn, D.C.Mich., 18 F.2d 291; Tweedie Trading Co. v. Strong & Trowbridge Co., 2 Cir., 195 F. 929. The Glendola, supra, limited the recoverable items to expenses for wages, provisions, fuel and stores.

charterer, claimant is nevertheless bound by it and cannot ask to have the charter construed in a manner inconsistent with it.

Claimant's exceptions to the award to the Camden are overruled.

The recommendations of the report of the Commissioner are accordingly approved.

### On Rehearing

Both parties have moved for a limited reargument of their exceptions to the report of the Commissioner. Libellant points out certain mathematical errors in the Commissioner's computation not previously excepted to. Claimant argues once again its contention that it should be reimbursed for expenses it incurred for wages, provisions, stores and fuel during the period of detention.

Libellant's motion is granted. The Commissioner's computation contained a mathematical error in the computation of voyage expenses of the Camden in the amount of $100. It also, by oversight, omitted from the total amount of these expenses an item for port charges in the amount of $1,508.19. Correctly computed these charges were therefore $17,821.90, rather than $16,213.71. Deducting the correct amount of these expenses from the gross charter hire of the vessel as found by the Commissioner for the detention period, the detention loss of the Camden should have been stated at $20,573.10, rather than $22,181.29.

The claimant's application for reargument is denied. As stated in my original opinion, there is no basis in the record for computing the expenses *required* for the Camden during her period of detention. To be sure, the stipulation of the parties states the amount actually expended during this period, $9,037.29, but this amount is substantially the same as would have been required if the vessel had been actively engaged. In the absence of any showing that this amount was *necessary* for the vessel's maintenance while undergoing repairs it may not be allowed. The mere fact that substantially a full crew was continued in employment was not in itself proof that a full crew was necessary or that it was not productively used in connection with owner's repairs and overhaul during this period. Libellant is not properly chargeable for such expense.

The damages of the claimant, as found by the Commissioner, in the sum of $66,796.42, are reduced to the sum of $65,368.23. In all other respects the applications for reargument are denied.