COMPANIA PUNTA ALTA, S.A., as owner of THE Steamship MARJORY, Libelant,

v.

Lloyd H. DALZELL, as managing owner, and tugs THE DALZELLACE, THE CAPTAIN A. F. BENNETT, THE LLOYD H. DALZELL and THE DALZELLITE, Respondents.

Lloyd H. DALZELL, as managing owner of tugs The Dalzellace, The Captain A. F. Bennett, The Lloyd H. Dalzell and The Dalzellite, Cross-Libelant,

v.

COMPANIA PUNTA ALTA, S. A., Cross-Respondent.

INSURANCE COMPANY OF NORTH AMERICA et al., Libelants,

v.

Lloyd H. DALZELL, as managing owner and tugs The Dalzellace, The Captain A. F. Bennett, The Lloyd H. Dalzell and The Dalzellite, Respondents.

United States District Court
S. D. New York.
May 28, 1958.

Herbert P. Reid, Nelson, Healy, Baillie & Burke, New York City, of counsel, for libelant.

Nicholas J. Healy, 3rd, Francis P. Cox, New York City, Advocates.

Burlingham, Hupper & Kennedy, New York City, for respondents. Eugene Underwood, Robert F. Lynch, New York City, of counsel.

DIMOCK, District Judge.

Respondents except to the report of Paul E. Lockwood, Esq., who was appointed, pursuant to an interlocutory decree of this court dated February 29, 1952, Commissioner to ascertain and compute damages.

The controversy arose out of a collision which occurred on December 11, 1946, between the S. S. Marjory, owned

by Compania Punta Alta, S. A., hereinafter libelant, and the S. S. Joseph E. Wing, a dead ship in tow of four tugs owned by Lloyd H. Dalzell, hereinafter respondent. The only physical damage resulting from the collision was that sustained by libelant, the live ship. Temporary and then permanent repairs were made to the ship and, after the temporary repairs had been completed, libelant asserted its right to general average contribution. Security was obtained from insured cargo but not from uninsured.

On May 4, 1948, libelant brought this libel against respondents, the four tugs and their owner, for damages. Thereafter Insurance Company of North America and others, as insurers of part of the cargo on the live ship, brought a libel against respondent for recovery of that cargo's contributions in general average. Respondent filed a cross-libel against libelant for recoupment in the event of a recovery by the insurers against respondent. The suits were consolidated.

In a general average adjustment dated July 31, 1950, it was determined that the insured cargo's share of the damage was $6,653.62. This sum libelant collected from the insurers. The uninsured cargo's share of the damage was determined to be $4,311.36 but it was not collected by libelant.

The decree of February 29, 1952, determined that libelant and respondent were both to blame and provided for equal division of damages. It further directed that the insurers should recover their damages from respondent and that the amount which would be paid by respondent to reimburse the insurers pursuant to this direction should be included by respondent in the amount of the damage to be shared equally between it and libelant.

The conclusions reached by the Commissioner may be tabulated as follows:

| | | |
|---|---|---|
| Expense incurred by libelant as a result of the collision including cost of temporary and permanent repairs and cost of general average adjustment | | $21,856.07 |
| Interest on claim of insurers of cargo for reimbursement of amount paid by insurers to libelant in satisfaction of insured cargo owners' liability in general average | | 532.29 |
| Total damages | | $22,388.36 |
| Amount of respondent's liability being one-half of total damages | | $11,194.18 |
| Less amount paid by respondent to insurers of cargo in reimbursement of amount paid by insurers to libelant in satisfaction of insured cargo owners' liability in general average: | | |
| Principal | $6,653.62 | |
| Interest | 532.29 | 7,185.91 |
| Balance due from respondent to libelant | | $4,008.27 |

*I*

Respondent excepts to the Commissioner's refusal to deduct from the shared damages the sum of $4,311.36, representing the general average contribution due but not collected from uninsured cargo.

The Commissioner in refusing to make this deduction relied on Pool Shipping Co. v. United States, 2 Cir., 33 F.2d 275, which held, per A. Hand, C. J., that a carrying vessel's damages should not be reduced by the contribution in general average made by the cargo to the carrying vessel. The court stated that if the sum has been paid by the cargo the carrying vessel can recover "for the benefit of the cargo" and "[i]f, on the other hand, the cargo has not paid its general average contribution", the carrying vessel may "recover this amount in its own right against the tort-feasor as part of the collision damages." Id., at page 277.

Respondent contends that this case is no longer good law in that the analogy drawn by the court between general average and an insurance claim, with respect to which the cargo owner in effect would be subrogated to the claim of the shipowner against the tort-feasor in the amount of its contribution, was repudiated by the Supreme Court in Aktieselskabet Cuzco v. The Sucarseco, 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942. The rule in the Pool Shipping case does not stand or fall on this analogy which was repudiated in the Sucarseco case; on the contrary it is supported by the analysis of the nature of general average in the two cases relied on by respondent: the Sucarseco case and Morrison Steamship Co., Ld. v. Greystoke Castle (Cargo Owners) [1947] A.C. 265, where the House of Lords, affirming the decision of the Court of Appeal (sub. nom. "The Cheldale") [1945] P. 10 (C.A.), adopted the rule of the Sucarseco case.

In these two cases the courts held that the cargo owner had a direct right against the tort-feasor for the amount of its loss as measured by the general average contribution that it paid. In defining the nature of general average, Chief Justice Hughes stated, 294 U.S. at page 404, 55 S.Ct. at page 471:

"The nature of these expenditures and the fact that they are traceable directly to the collision are not changed by the sharing in general average. That merely affects the distribution of the loss, not its cause. The claim of the cargo owners for their general average contributions is not in any sense a derivative claim. It accrues to the cargo owners in their own right. It accrues because of cargo's own participation in the common adventure and the action taken on behalf of cargo and by its representative to avert a peril with which that adventure was threatened."

It follows that the "common adventure" collectively is entitled to recover the full amount of expenditures resulting from the collision and made for the benefit of those who share in the adventure; the general average contributions "merely affect the distribution of the loss". If the carrying ship incurs the entire expense and chooses to bear that expense rather than collect the share due from its fellow adventurers, the cargo owners, it may certainly recover its total expense from the tort-feasor.

The right of the shipowner to recover its total expense for the adventure resulting from the collision was expressly recognized by the three opinions constituting the majority in the House of Lords in "The Cheldale", supra.[1] Lord Porter stated at p. 298:

"[I]n my view the injured ship might sue not only for her own direct loss but also for any damage to the cargo of which she was bailee, and similarly might sue as bailee for the expense to which she was put in incurring general average expenditure even though that expense was incurred in the general interest of all those concerned in the adventure."[2]

1. The dissenting opinion of Lord Simonds, [1947] A.C. at 300, expressed the view that only the shipowner could sue.
2. See also the opinion of Lord Roche, [1947] A.C. at 277 and the opinion of Lord Uthwatt, id. at 308, recognizing the right of the shipowner to recover from the tort-feasor amounts of general average contribution on analogy to the right of a bailee to sue for the benefit

Lord Justice Scott's view below, [1945] P. at 13, cited by respondent, that the tort-feasor was liable to the injured shipowner for its net loss only, i. e., after deducting the amount recovered by general average contribution, was expressly rejected by the House of Lords. 1947 A.C. at 276, 286.

Permitting the injured shipowner to recover amounts of general average contribution, especially when uncollected, makes good sense in that it efficiently places the loss upon the party who must ultimately bear such loss, the tort-feasor, without undue multiplicity of actions. This case is an ideal example of the necessity for permitting such recovery. Respondent, for the purposes of this inquiry, is in the position of tort-feasor. There are 326 uninsured cargo owners whose general average contributions and whose consequent claims against respondent if those contributions were paid would have amounted to an average of $13 each. Respondent admits that these claims were so numerous that they could not be effectively prosecuted by the cargo owners against him. Moreover if the claims were prosecuted individually respondent would be subject to unnecessary multiplicity. Libelant here bore the expense itself, thereby saving the cargo owners from having to pay their general average contributions and then sue respondent and, in addition, saving respondent from being harassed by more than one action to determine the amount for which he would be liable.

Respondent's contention, that the collection of the entire amount of the general average contribution due was necessary to mitigate the shipowner's damage, flies in the face of the nature of general average as defined above. The damage was incurred as a result of the collision and "the distribution of the loss" between the shipowner and cargo owners has no bearing on the total amount of respondent's liability. The shipowner is not, as respondent implies, under any duty to respondent to collect from the cargo owners and then leave them to sue in their own right, in order to give respondent the benefit of the chance that their claims would be so small that they would not sue at all.[3]

■ The Commissioner was correct in refusing to deduct the uncollected general average contribution.

## II

■ As an alternative to the last exception, respondent excepts to the allowance of expenses, which it computes in the amount of $4,167.60, incidental to the adjustment of general average. The costs of the adjuster's services and similar costs of adjusting the general average are considered necessary to the apportionment of the loss resulting from the collision and therefore recoverable by the shipowner. Moore-McCormack Lines v. The Esso Camden, 2 Cir., 244 F.2d 198, 202. Respondent contends, however, that, as a penalty for failure to collect the general average contributions from the uninsured cargo, libelant ought to be denied the right of including the costs of adjustment in the damages to be borne equally. As stated above, libelant owed no duty to respondent to collect general average contributions from cargo in full. Hence its omission to collect them in full ought not to affect its right to charge, as part of the damage, expenses of stating general average. A collision case might be imagined where a ship might institute proceedings for stating general average under circumstances where the result could not be of advantage to the instituting ship and would be of disadvantage to the other, but, short of that, the expense

of his bailor recognized in "The Winkfield" [1902] P. 42 (C.A.).

3. Dibrell Bros. v. Prince Line, 2 Cir., 58 F.2d 959, relied on by respondents, holds that the shipowner's duty to take security for general average contribution from all cargo owners runs to the cargo owner whose goods are damaged. Failure to take such security gives rise to a right of action by the cargo owner whose goods are damaged against the shipowner to recover damages equal in amount to the general average contribution for which the excepted cargo would have been liable. The case does not hold that any such duty runs to the tort-feasor.

of the proceedings may be charged as part of the damage.

### III

■■ Respondent excepts to the allowance of expenses for temporary repairs as items 19, 21, 23 and that part of item 27 which constitutes the cost of removal of the temporary repairs. Temporary repairs were made immediately after the collision to the extent necessary to make the Marjory seaworthy and able to continue her voyage. The American Bureau of Shipping surveyor found that permanent repairs could safely be postponed until November, 1947. On January 23, 1947, the Marjory sustained propeller damage which required prompt repair. She was drydocked from March 2nd or 3rd to March 8, 1947, for the purpose of repairing the propeller, and at that time the damage from the December 11th collision was permanently repaired. Respondent contends that the decision to postpone the permanent repairs was improper in that libelant could have reduced its expenses if it had made permanent repairs immediately.

In passing on the propriety of these expenses the Commissioner applied the correct standard to the conduct of the shipowner. The test was stated by Judge Learned Hand in Pan American Petroleum & Transport Co. v. United States, 2 Cir., 27 F.2d 684, and by Judge Swan in The Pocahontas, 2 Cir., 109 F.2d 929, certiorari denied Eagle Transport Co. v. U. S., 310 U.S. 641, 60 S.Ct. 1088, 84 L.Ed. 1409, where the issue before each was the allowance of damages occasioned by detention for permanent repairs made immediately after collision:

> "The test in such cases is, not the judgment of the victim of the wrong, but the objective standard of a reasonable person." 27 F.2d at pages 685–686.

> "Even if the collision damage does not in fact require immediate repairs, the owner may in good faith and reasonably believe that it does; and, in that event, he would be justi-

fied in sending her to dry-dock." 109 F.2d at page 931.

The Commissioner found that libelant exercised "ordinary precaution not to increase damages", that the course followed here was "reasonably necessary" and "in good faith under the advice of competent experts."

The Commissioner's finding of fact that the procedure followed in repairing the Marjory was reasonable I do not find to be clearly erroneous. See The North Star, 2 Cir., 151 F. 168, 177; Moore-McCormack Lines v. The Esso Camden, D.C. S.D.N.Y., 141 F.Supp. 742, 747, affirmed 2 Cir., 244 F.2d 198, supra. Indeed it is more than adequately supported by testimony in the record. Libelant relied on the advice of Thomas L. Stanley, an independent surveyor retained by libelant to specify the repairs after the collision, and of James E. Schell, a surveyor for the American Bureau of Shipping who inspected the Marjory after the collision. Mr. Stanley testified that he advised libelant to postpone permanent repairs because the cost of permanent repairs as such would be no greater if they were postponed but, if they were made immediately, the shipowner would incur additional expenses including pier hire, discharging and reloading of cargo, damage to cargo on the pier and in the process of loading, and the expenses and losses of additional delay. Mr. Schell supported the testimony of Mr. Stanley to the effect that, in order to have made permanent repairs immediately, it would have been necessary to unload a large amount of cargo whereas only a small portion was unloaded for the temporary repairs, and it would have been necessary to drydock the vessel whereas the temporary repairs were made without drydocking. The competence of Mr. Stanley was established and the Commissioner was justified in finding that libelant's reliance on his advice and on his basis therefor was reasonable under the circumstances.

### IV

■ Respondent takes exception to that part of item 27, the cost of perma-

nent repairs, which it contends includes a charge for drydocking, and to item 33, charges for towage.

The Commissioner found that respondent ought not to be charged with loss of hire for the period during which the collision repairs were being made. This ruling was presumably based upon subsidiary findings that the collision repairs could have been accomplished at the time of the next annual survey and that the ship would necessarily be laid up then so that the collision repairs would not have caused any loss of hire. The ruling as to liability for loss of hire has not been challenged so that it is unnecessary to pass upon its basis. Respondent, however, evidently assumed that its basis was as stated and says that the Commissioner erred in not treating as he did loss of hire such cost of drydocking as is included in item 27, "cost of permanent repairs", and item 33, "charges for towage into drydock". The argument evidently is that drydocking and towing were a necessary part of the annual survey and that the collision repairs could have been made during the annual survey when the drydocking and towing would have been paid for out of the normal operating budget of libelant. There is, however, no evidence that the annual survey would necessarily have involved drydocking and towing. I thus find no reason for overturning the Commissioner's finding that the cost of drydocking and towing included in items 27 and 33 should be allowed.

### V

■ Libelant excepts to the equal apportionment of costs by the Commissioner. Libelant relies on Local Admiralty Rule 24 which provides for recovery of costs by a respondent who files a written offer of damages if the damages awarded do not exceed the amount of the offer. Libelant will recover more than the $900 offered by respondent in this case but I do not believe that the negative implication from Rule 24 which would result in an award of costs to libelant is warranted. In the absence of specific language in the rule, the allowance of costs remains in the sound discretion of the court. The James McWilliams, 2 Cir., 49 F.2d 1026. Even if, as libelant contends, the power to exercise this discretion rests with the court rather than with the Commissioner, I see no reason for departing from the finding of the Commissioner. He was in the best position to make the necessary equitable determination.

The exceptions are overruled and the report confirmed.